Stockton Harbor Industrial Company v. Commissioner.
Stockton Harbor Indus. Co. v. Commissioner
Docket Nos. 14654, 27870.
United States Tax Court
1952 Tax Ct. Memo LEXIS 259; 11 T.C.M. (CCH) 364; T.C.M. (RIA) 52103; April 15, 1952
*259 Valentine Brookes, Esq., for the petitioner. Leonard A. Marcussen, Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: Respondent has determined the following deficiencies against petitioner: Declared
Value
Docket
Income
Excess
Excess
No.
Year
Tax
Profits Tax
Profits Tax
14654
1943
$ 247.31
27870
1944
2,484.57
$ 319.97
$ 1,903.70
1945
840.13
42,005.24
233,840.02
At the hearing and after the completion of the testimony, respondent filed an amendment to his answer, in which he asserted a claim for an increased deficiency in income tax for 1943 in the amount of $58.85. It is petitioner's claim that it has made overpayments of income tax of $852.12 for 1943, and $13,414.86 for 1945. The questions to be determined are (1) the basis of the property petitioner disposed of during the taxable years, which in turn depends on whether petitioner acquired the property in a tax-free transaction, and (2) whether the gain realized by petitioner from the sale of its properties during the taxable years was taxable as capital gain, or as ordinary income. Other issues raised by the *260 pleadings have either been abandoned by petitioner or conceded by respondent, the effect of which will be given in recomputations under Rule 50. Findings of Fact Most of the facts have been stipulated and are found as stipulated. Petitioner is a California corporation, with its principal office and place of business in Stockton, California. It filed its returns for the years involved with the collector for the northern district of California. Petitioner was incorporated October 16, 1936. Ten days after its incorporation, it acquired certain assets of Lindley Patrick Farms, Inc. Lindley Patrick Farms, Inc., hereinafter referred to as Lindley Patrick, was a California corporation, incorporated on October 15, 1926. Lindley Patrick was president, director and sole stockholder of that corporation, and his wife was the other director. Albert Lindley, between the years 1912 and 1926, purchased various parcels of land, totaling approximately 1,150 acres, on and adjoining Rough and Ready Island. Rough and Ready Island, sometimes referred to herein as the Island, is situated in the delta of the San Joaquin River, near Stockton. Along the Island's northern boundary is the Stockton *261 Deep Water Channel which runs to the Port of Stockton, at Stockton. Lindley purchased the lands for the purpose of holding them for appreciation in value which he expected would result from public improvements for navigation, with the thought that, while awaiting such developments, he could farm the land and thereby receive income or rentals. Upon the organization of Lindley Patrick, Lindley transferred 1,110 acres of land to the corporation in exchange for all of its stock. The corporation was organized for the stated purpose of farming, working, developing and otherwise dealing with the properties acquired. In 1930, further improvements for navigation were planned by public authority and were later made. The Belt Line Railroad was proposed and constructed at approximately the same time. It was about that time that a demand arose for parcels of the property for water front and industrial uses. Lindley Patrick undertook to sell its lands in parcels for such purposes. By October 1, 1936, approximately 200 acres had been sold, but Lindley Patrick was in financial difficulties because of inability to pay $25,655.77 back taxes and mortgage interest. It was indebted to The San Francisco *262 Bank in the amount of $79,000, secured by a deed of trust, and to the Stockton Savings and Loan Bank in the amount of $45,595.65 and to L. F. Grimsley, Inc., in the amount of $3,557.97, both secured by a single second deed of trust. Interest on these debts had not been paid for several years, and by October 1, 1936, totaled about $20,500. In addition, the property was subject to liens for delinquent county taxes in the amount of $3,767.36. On October 6, 1936, Lindley Patrick gave Stuart L. Rawlings a written option "to purchase" its assets, the terms of which (as amended by an addendum dated October 8, 1936) were as follows: "(a) A new corporation was to be formed, whose object was to be the 'holding, operating and selling' of the real property, and which was to have a board of directors of three members, one of whom was to be Albert Lindley. "(b) 'The purchase price' of the property was 'to be paid' by the delivery to Lindley Patrick of 49 per cent of its stock, subject to the payment of the principal sum of certain promissory notes, as follows: Balance of principal sum due on
promissory note held by San
Francisco Bank
$79,000.00
Balance due on promissory note
held by Stockton Savings and
Loan Bank
100.00
Balance due on promissory notes
held by Stockton Savings and
Loan Bank
45,495.65
Balance due on promissory notes
held by L. F. Grimsley, Inc
3,463.22
*263 together with interest on each of the said promissory notes in accordance with the terms thereof now accrued and which may accrue to the date of the delivery of the deed hereunder to the said corporation. "(c) Rawlings was to pay to the new corporation a sum of $30,000, and receive 51 per cent of its stock. "(d) The $30,000 was to be used by the new corporation to pay the delinquent taxes and the overdue interest, and any balance was to remain in the treasury of the new corporation. "(e) Rawlings was to lend $20,000 to Lindley Patrick, to be secured by the pledge of its 49 per cent of the stock in the new corporation." On October 15, 1936, the Stockton Savings and Loan Bank bought from The San Francisco Bank its entire interest in the first deed of trust for the face amount of the principal and overdue interest, plus one dollar for a release. E. L. Wilhoit was at that time president of the Stockton Savings and Loan Bank and is now chairman of its board of directors. On October 16, 1936, petitioner was incorporated by E. L. Wilhoit, R. L. Eberhardt and Stuart L. Rawlings, each receiving one $50 share of stock. It had a capital stock of $60,000, divided into 1,200 shares, of *264 a par value of $50 each, all of which was common stock. Its stated powers and purposes were, among other things, "to acquire, own, subdivide, develop, improve, buy, sell, lease * * * all kinds of land and personal property; * * * to transact any other kind of business that may be beneficial and desirable for the stockholders." On October 22, 1936, the directors of Lindley Patrick resolved to deed the real property to petitioner, subject to the principal amount of the encumbrances, and to transfer to petitioner a related obligation of the City of Stockton, and five promissory notes made by Grant B. Shipley to Lindley Patrick, hereinafter referred to as the Shipley notes. The resolution stated "the consideration therefor to this corporation to be the sum of approximately $25,655.77 in cash, and five hundred ninety-nine (599) shares of the capital stock of" petitioner. Two days later, on October 24, 1936, petitioner's board of directors adopted a resolution to acquire from Lindley Patrick all of the real property, the related obligation of the City of Stockton and the Shipley notes. The real property was to be acquired subject to the deeds of trust securing the principal of the notes, *265 and to the second installment of the current realty taxes. The resolution also provided that "The consideration to be paid therefor by this corporation to the said Lindley Patrick Farms, Inc., is the sum of $25,655.77 and the issuance by this corporation to Lindley Patrick Farms, Inc., of 599 shares of the capital stock of this corporation." Also on the same day, October 24, 1936, petitioner's board of directors, by resolution, instructed its officers to apply to the State Corporation Commission for a permit to issue additional shares of stock, for the following named consideration: E. L. Wilhoit
259 shares for $12,950
Stuart L. Rawings
239 shares for 11,950
William Wallace Mein
100 shares for 5,000
Lindley Patrick Farms,
Inc.
599 shares, for the
transfer of the prop-
erty subject to the
encumbrances de-
scribed above. The resolution also recited that "in addition to the said 599 shares of the capital stock of this corporation, there is to be paid to the Lindley Patrick Farms, Inc., the sum of $25,655.77." On October 22, 1936, [1] two days prior to the date of the above resolution, petitioner filed with the Corporation Commissioner its application *266 for a permit to issue stock. This application stated, inter alia, that stock was to be issued for cash to the individuals above named in the total of 601 shares and that the corporation was to acquire from Lindley Patrick certain of its assets; that the 902 acres of land to be acquired from Lindley Patrick had been appraised at the sum of $418,000; "that said property is to be acquired subject to the payment of the principal sum of secured indebtedness, the total amount of which is the sum of $128,153.62," and which indebtedness was secured by five separate deeds of trust; "that the consideration to be paid by this corporation for said real and personal property is the sum of $25,655.77 and 599 shares of the capital stock of this corporation"; and "that this corporation has been formed and organized primarily for the purpose of acquiring and dealing *267 in real estate of all kinds, and of improving, subdividing, and selling the same." Petitioner's officers were designated and described in the application. E. L. Wilhoit was designated as president. It was stated that for more than twenty-five years, he had been engaged in buying and selling real estate and that at that time was president of the Stockton Savings and Loan Bank, of Stockton, a capacity in which he had served for many years. Stuart L. Rawlings, who was shown as having been actively engaged in selling and buying real estate and as being associated with a cement company, an oil company and other corporations at that time, was designated as executive vice president. Albert Lindley was shown as vice president and general manager. It was stated that for many years he had owned real estate situated in San Joaquin County and that he had operated his properties as farming lands, had subdivided and sold portions for industrial purposes, and was thoroughly acquainted with the real property to be acquired by petitioner. Freda Keser, who was shown at that time to be secretary to Wilhoit, was designated as secretary and treasurer. She was described as an experienced secretary and *268 accountant. The permit was issued October 23, 1936. It authorized petitioner to issue 599 shares of its stock to Lindley Patrick Farms, Inc., for "the property and assets described in its application * * * subject to liabilities and encumbrances not exceeding in the aggregate $153,809.39." It also authorized petitioner to issue "601 shares to the persons named in its application at par for cash." Upon receipt of this permit, petitioner issued 599 shares of its stock in the name of Lindley Patrick Farms, Inc., and 601 shares to individuals as follows: Number
Name
of Shares
Amount
E. L. Wilhoit
1
$ 50
E. L. Wilhoit
239
11,950
E. L. Wilhoit
20
1,000
Stuart L. Rawlings
1
50
Stuart L. Rawlings
239
11,950
William Wallace Mein
100
5,000
R. L. Eberhardt
1
50
601
$30,050
On October 24, 1936, Lindley Patrick wrote a letter of instructions to the Security Title Insurance and Guarantee Company, the escrow agent, and transmitted with it the deed to the 902 acres of real property, the assignments to the Shipley notes and to the Stockton obligation, and also a $20,000 demand note executed by it and made payable to Stuart L. Rawlings, with a pledge *269 agreement hypothecating its stock in petitioner as security for the note. In the letter, it was stated: "6. There will be handed to you for the account of the undersigned by Stockton Harbor Industrial Company, the sum of $25,655.77, which said sum is to be disbursed by you in the following manner, to-wit: Stockton Savings & Loan Bank - inter-
est on $79,000.00 note
$14,357.81
Stockton Savings & Loan Bank - inter-
est on $100.00 note and $45,495.65
note
6,156.47
L. F. Grimsley, Inc. - interest on notes
totalling $3,557.97
798.87
Redemption from Tax Sales
3,767.36
First Installment of State and County
Taxes, for 1936-1937
575.26
All interest to be paid to Oct. 24, 1936.
"After payment of the above amounts, any surplus remaining is to be paid by you to the Stockton Harbor Industrial Company. "There will also be handed to you for the account of the undersigned, certificate or certificates for 588 shares of the capital stock of the Stockton Harbor Industrial Company, this stock to be issued in the name of Lindley Patrick Farms, Inc., Stuart L. Rawlings, pledgee. "The deed numbered 1, assignment numbered 2, and assignment numbered 3, are to be delivered *270 to the Stockton Harbor Industrial Company, upon the payment of the money, and the delivery of the stock as hereinabove set forth, and thereupon you are authorized to deliver the said stock in pledge, the said promissory note, and said pledge agreement, upon the said certificate of stock being properly endorsed, upon their being delivered to you for the account of the undersigned, of the sum of $20,000.00. "Deliveries herein authorized are to be made only at the consummation of one transaction, including the conveyance of the property and the issuance of the stock, and the pledge thereof, in accordance with the terms hereinabove set forth. "The President of the corporation is authorized to make such changes in the foregoing instructions as may be necessary to accomplish the purposes and objects thereof." The letter was signed by Albert Lindley, as president of Lindley Patrick Farms, Inc. At the foot of the instructions is the following statement, dated October 24, 1936, and signed by petitioner through its president, E. L. Wilhoit: "We hand you herewith the sum of $25,655.77 which you are directed to use in accordance with the foregoing instructions, which we approve, PROVIDED *271 nothing has transpired affecting the property subject of this escrow, since your report No. 68832 of date of October 20, 1936. We also deliver you herewith Certificate No. 8, and Certificate No. 11 for 587 and 1 share, respectively, Stockton Harbor Industrial Company Stock for delivery to Lindley Patrick Farms, Inc." The contemplated acts by the escrow agent were carried out in accordance with the instructions received. Lindley Patrick reported and deducted a loss from this transaction in its 1936 income tax return, which return was not audited and the claimed deduction was not disallowed. Lindley Patrick did not transfer to petitioner but retained, and on October 27, 1936, had on hand, notes and accounts receivable from Albert Lindley in the amount of $29,553.74; and machinery and equipment of a book value of $12,025.93, which had an actual value of $500. On the same date, it had outstanding accounts payable of approximately $30,000. Lindley made substantial payment on his indebtedness to Lindley Patrick, but there is no record that he ever liquidated it entirely. Lindley Patrick was not dissolved prior to 1942. At the time petitioner required "the approximately 902 acres of *272 land" from Lindley Patrick, the land had a fair market value of $380,000. The value of the other assets acquired were as follows: Shipley notes - 5 at $2,500
$12,500.00
Accrued interest on Shipley notes,
August 5, 1936 to October 22, 1936
- about
162.50
Amount due from City of Stockton
4,188.00
Accrued interest on amount due from
City of Stockton
775.74
Total
$17,626.24
Petitioner acquired the real property for the purpose of developing and selling it as industrial property. It was adjacent to the Port of Stockton and gas for commercial use was available from wells approximately four miles away. There had been some hope that gas and oil might be obtained on petitioner's property, from tests that had previously been made. In November 1937, petitioner entered into an oil and gas lease with certain persons who thereafter assigned their interests to Utilities Petroleum Corporation. This lease provided for an in-kind royalty of 20 per cent to petitioner as lessor. It remained in effect with extensions until December 10, 1941. A well was drilled in 1941, but neither oil nor gas was found. In 1938, petitioner received $5,000 in cash income from Utilities Petroleum *273 Corporation in connection with an extension of the lease, which it reported in its return for that year as rental income. No sale or exchange was involved. Petitioner did not farm its lands, but leased them to farmers for agricultural purposes, including grazing. It received rentals both in crop payments and in cash. The amounts received by petitioner as rents from agricultural tenants, as shown on its income tax returns, were as follows: 1936
$ 100.00
1937
4,268.01
1938
6,319.70
1939
6,663.23
1940
6,231.09
1941
10,251.63
1942
11,861.35
1943
12,925.66
1944
8,331.44
1945
1,694.04
Petitioner, upon its organization, received much publicity from the local newspapers with respect to the development of its properties for industrial uses. In 1937, it joined other organizations and individuals in honoring a citizen of a nearby community by inserting in a newspaper, the Byron Times, a display advertisement, which read as follows: "BEST WISHES to a Great Builder on his Diamond Birthday. "In our efforts to boost the Port of Stockton throughout the years we have come to appreciate your work the more through difficulties we have encountered. Our efforts *274 are now concentrated on developing Rough and Ready Island, across the heart of which travels great Borden Highway. "Mr. Albert Lindley, who has owned the land for 25 years; Mr. E. L. Wilhoit, president of Stockton Savings and Loan Bank; Stuart A. Rawlings, director of Bank of California, Pacific Telephone and Telegraph Company, etc., and William Wallace Mein, noted mining engineer, president of Calaveras Cement Company and director of International Nickel Company, are financially interested in the work. "Mr. Lindley is personally retaining his fine home on the tip of the island as well as some 400 acres adjoining the municipal wharves. Mr. Wilhoit, by adding this project to his other Delta holdings - including about 5400 acres in Byron Tract - has again demonstrated his faith in the lands. All of us look with confidence at the future of Port Stockton. "And we know that future will bring you the happiness your splendid efforts have earned. "STOCKTON HARBOR INDUSTRIAL COMPANY Manufacturing, Industrial, Wharf and Warehouse Sites Albert Lindley, General Manager "Rough and Ready Island Stockton, Calif." In the left-hand corner of the advertisement there was a map on which *275 was shown the Port of Stockton, and the following holdings on or adjoining the Island: "A. Oil refinery and storage tanks B. Proposed town site C. Belt Line Railroad 1. Port Stockton Oil District and wharf 2. Grant B. Shipley holdings 3. Residential tract, Stockton Harbor Industrial Co.
4. Industrial tract, Stockton Harbor Industrial Co.
5. Albert Lindley holdings" In the latter part of 1939, petitioner engaged an attorney as its agent to effectuate the sale of part of its property for purposes of locating a shipyard thereon, to be operated by the Kaiser interests. The agent's efforts were unsuccessful, but in early 1941, he interested Rheem Manufacturing Company of San Francisco and Richmond, California, in shipbuilding and attempted to effectuate the sale of petitioner's property for a shipyard, to be operated by Rheem. Beginning with March 4, 1941, petitioner, from time to time, granted the agent assignable options to purchase a part of its property and entered into written agreements with him as to the compensation he was to receive for his efforts. These written agreements were in substance the same as the prior oral agreements under which the agent had worked. *276 In the course of his efforts, the agent concluded that the prospects for leasing a part of petitioner's land for use as a shipyard were better than for sale, and, with petitioner's approval, he attempted to lease the property for this purpose. All of the agent's efforts to create a shipyard on the Island were fruitless. Petitioner used stationery, the letterhead of which was as follows: "STOCKTON HARBOR INDUSTRIAL COMPANY
"E. L. Wilhoit
Wharf, Warehouse
Albert Lindley
President
and
Vice-Pres., Gen. Mgr.
"Stuart L. Rawlings
Manufacturing Sites
Rough and Ready Island
Executive Vice-Pres.
Stockton, Calif."
Stockton, California
On the back of the stationery, there was a map of the Island and adjoining property, including the City of Stockton and the deep water channel. It showed property owned by petitioner, Albert Lindley and others. Above the map was the following statement: "STOCKTON HARBOR INDUSTRIAL COMPANY "Two Miles of Water Frontage Visited Daily by Ocean-Going Vessels and Served by Three Transcontinental Railways" Below the map appeared the following statement: "Shown above is the Company's 1000 Acres of Manufacturing, Industrial *277 and Warehouse Sites CALIFORNIA'S INLAND HARBOR, CENTER OF PRODUCTION AND DISTRIBUTION Solid Level Land, Unlimited Free Fresh Water, No City Taxes or Regulation, No Engineering Problem For Information Address Albert Lindley, General Manager, Rough and Ready Island Stockton, California" This type of stationery was used by petitioner until it sold its property to the Navy. Part of the Island, between the channel and the Belt Line Railroad, was covered by a deep overlay of sand and gravel fill which was pumped on the Island when the deep water channel was being dredged in the years immediately before 1930. The fill area was unusual among delta lands for its ability to support heavy structures without need for pilings and therefore was unusually well suited to industrial, dockage and warehouse uses. The balance of the land was capable of supporting heavy structures with pilings driven to a depth of 38 feet. In a letter to the internal revenue agent in charge, dated September 25, 1942, petitioner, protesting against a proposed income tax deficiency for 1939 and 1940, in part, stated: "The corporation was organized October 16, 1936, for the purpose of holding title to real property *278 adjacent to the Port of Stockton and with frontage extending along the San Joaquin River deep water channel. Said real property was to be offered for sale in parcels for industrial purposes. * * * "* * * The real properties of the corporation are held primarily for sale, and in the event of other than a cash transaction, profit or loss would be 'accrued' upon a sale or sales of real property." Neither Lindley Patrick nor petitioner subdivided the land into sites or tracts. Lindley Patrick had considered laying out the property into defined lots for sale, but preferred to treat it as all for sale and to locate individual industries, from point to point, in accordance with their respective requirements and without permitting any haphazard or destructive selections. Petitioner continued that policy. In March 1942, Albert Lindley, then a director, vice president and general manager of petitioner, and who operated from his residence on the Island, exhibited petitioner's property on the Island to two real estate brokers of Stockton, for the purpose of acquainting them with the property and informing them of the prices at which various parcels were available for sale. It was understood *279 that if the brokers were instrumental in bringing about the sale of any part of the properties they would receive the usual real estate agent's commission. Lindley informed them that petitioner was primarily interested in selling rather than leasing parcels of the property, but that consideration would be given to prospects for leases on mutually satisfactory terms. In the normal course of events, it would take a number of years to dispose of such a large acreage as petitioner's Island property for industrial and water front purposes, considering the industrial potentiality of the Stockton area. Prior to 1942, any sales or leases of petitioner's property were made by direct contact between Lindley and the prospect. Petitioner made the following sales: 1937 - 13.028 acres to General Petroleum Company, for $15,000 1940 - 13.03 acres to Shell Oil Company, for $25,000 1937 - 1.69 acres to State of California
1940 - 1.78 acres to State of California
The first two listed sales were of property fronting on the Stockton Deep Water Channel for use as oil storage and distribution facilities. The other two sales were permit improvements by the State of California in the width and *280 depth of the channel. In 1943, petitioner sold an islet comprising 4.77 acres, for $2,500. Selling expenses were $147.45. On April 14, 1944, petitioner sold 213.83 acres of land to P. Baldocchi for $42,000, less selling expenses of $1,139.20. This acreage was roughly triangular and was situated between the Borden Highway, the County Road and the Burns Cutoff, a stream of water connecting the Stockton Deep Water Channel and the San Joaquin River. Baldocchi farmed the land as long as he owned it. Prior to the sale to Baldocchi, petitioner had discussed the sale of its lands on the Island to the Navy and had quoted a price of $509,550, in which the land later sold to Baldocchi was included at a price of $69,550. On August 1, 1944, the United States instituted condemnation action in the United States District Court against all owners of land on the Island, including petitioner and Albert Lindley, and on August 10, 1944, an order granting the United States immediate possession was entered. Petitioner and the United States eventually settled the fair value issue by agreeing to a price of $415,000, and a stipulation to that effect was filed on January 2, 1945. Judgment was entered in *281 accordance with the stipulation and petitioner received payment in 1945. Petitioner welcomed and encouraged the Navy to acquire its property on the Island. On May 23, 1945, petitioner sold the remainder of its real property to Albert Lindley for $15,000. This property consisted principally of a roughly triangular section of land across the channel from the Island and adjacent to the Stockton Golf and Country Club. After selling its property, petitioner's directors, on July 13, 1945, adopted a resolution to dissolve. The resolution recited that petitioner's assets had been converted into cash and instructed the officers to make a distribution in liquidation of $200 a share at once, and to distribute the balance after petitioner's tax liabilities should be determined and paid. The distribution commenced on July 26, 1945, and ended on August 2, 1945. A Federal income tax return was filed by petitioner for 1945 on July 4, 1945, and was marked "Final Return." Federal income tax returns were subsequently filed for the taxable years 1946, 1947, 1948 and 1949, each of which was filed on or before March 15 of the succeeding year. Each of these returns showed gross income consisting of *282 interest, and deductions consisting of taxes, interest and payments for services arising out of past transactions. The 1946 return showed a net loss of $22.46; the 1947 return showed a net loss of $4,897.73, and subsequently a claim for refund was filed, in which the loss was shown at $17,922.51; the 1948 return showed a net income of $1,947.85; and the 1949 return showed a net income of $2,013.72. Federal income taxes were paid in the amount of $409.04 for the year 1948, and in the amount of $422.88 for the year 1949. State franchise tax returns were filed for all of these years, the minimum tax was paid for 1946 and 1947, and the tax measured by net income for the two ensuing years. From January 1, 1946, and until January 1, 1950, petitioner had assets of a value of approximately $60,000, consisting principally of cash and of notes of the College of the Pacific and of local business concerns which it purchased during that period. Petitioner has not been dissolved. Petitioner paid Federal income taxes for 1945 in the amount of $13,414.86. The sum of $25,655.77 paid by petitioner into escrow at the time it acquired the assets of Lindley Patrick did not constitute an additional *283 cash consideration paid to Lindley Patrick by petitioner for the property. The $20,000 loan from Rawlings to Lindley Patrick was not consideration paid by petitioner for the assets of Lindley Patrick. Petitioner acquired and held its real property prior to the final disposition of it in 1945 primarily for sale to customers in the ordinary course of its business. Opinion The questions for determination are (1) as to the basis of the properties sold by petitioner during the taxable years, and (2) whether the gains realized from such sales should be treated as capital gains, or ordinary income. In determining petitioner's basis of the properties sold, the first question is whether they were acquired in a reorganization or some other transaction, wherein the gain or loss is not to be recognized. If they were so acquired, section 113 (a) (7) of the Internal Revenue Code applies and petitioner's basis for the said properties was the same as that of its transferor, and as to the basis of the transferor there is no controversy here. Respondent's determination is based upon the contention that the transaction comes within the purview of sections 112 (b) (4) *284 and 112 (g) (1) (C) of the Internal Revenue Code, which provide: "SEC. 112. RECOGNITION OF GAIN OR LOSS. * * *
"(b) Exchanges Solely in Kind. - * * * "(4) Same. - Gain of Corporation. - No gain or loss shall be recognized if a corporation a party to a reorganization exchanges property, in pursuance of a plan of reorganization, solely for stock or securities in another corporation a party to the reorganization. * * *
"(g) Definition of Reorganization. - As used in this section * * * "(1) The term 'reorganization' means * * * (C) the acquisition by one corporation, in exchange solely for all or a part of its voting stock, of substantially all the properties of another corporation, but in determining whether the exchange is solely for voting stock the assumption by the acquiring corporation of a liability of the other, or the fact that property acquired is subject to a liability, shall be disregarded, * * *." It is petitioner's contention that the transaction was not a nontaxable transaction, the argument being that the properties were not acquired solely for all or a part of petitioner's stock, in that it acquired the properties for *285 599 shares of its stock, plus $25,655.77 in cash. It also places reliance on the fact that Lindley Patrick received a loan of $20,000 from Stuart L. Rawlings, one of petitioner's stockholders. It contends that either, or both, would constitute additional consideration paid to Lindley Patrick for the properties, to the end that they were not acquired from Lindley Patrick solely for voting stock within the meaning of section 112 (g) (1) (C), supra. Respondent, on brief, took note of the fact that petitioner had made no claims that it did not acquire substantially all of the properties of Lindley Patrick and petitioner, in reply, still rested its case on the proposition that the properties were not acquired in exchange solely for voting stock. We accordingly conclude that petitioner concedes the acquisition by it of substantially all of the properties of Lindley Patrick within the meaning of the statute. Petitioner's contention that it did not acquire the assets of Lindley Patrick "in exchange solely for all or a part of its voting stock" appears to be based on the phraseology of the resolutions of the two corporations referring to the consideration to be paid to Lindley Patrick as *286 599 shares of petitioner's stock and $25,655.77, and some of the phraseology in the letter of instructions to the escrow agent as to the final steps to be taken in carrying out the plan. It is contended, on the basis of the wording used, that the cash payment was additional consideration to Lindley Patrick, that the wording used is controlling and consequently there was no transfer of property solely for stock so as to bring the transaction within the statute as a nontaxable transfer. While we do not agree with petitioner on its interpretations of the language used in those documents, in relation to what actually took place, we think there are other matters that bear on the factual situation, which, considered along with the aforementioned resolutions and escrow instructions, refute the contention. Lindley Patrick's financial difficulties were attributable not only to its principal outstanding indebtedness, but they were due also to its inability to pay its current liabilities of accrued interest on such indebtedness, and back taxes on its properties. The latter had become pressing obligations. In order to protect its holdings, Lindley Patrick was forced to do something. Its property *287 exceeded in value its obligations and it still had faith in the future development of its real property. These circumstances led Lindley Patrick to give an option to Rawlings, a successful businessman and promoter, to purchase its property or assets within a thirty-day period. Upon acceptance of the option by Rawlings, Lindley Patrick and he were to cause a new corporation to be formed. The option agreement was the initial step in a reorganization plan. It provided, inter alia, that the new corporation was to assume the principal indebtedness of Lindley Patrick and payment of the interest and taxes owed by Lindley Patrick was to be made out of $30,000 that was to be paid into the treasury of the new corporation by Rawlings and associates for their shares of stock. Any balance, after the payment of such liabilities, was to remain in the treasury of the new corporation and to be available in the usual manner for operation of the property acquired from the old corporation. Lindley Patrick and Rawlings were thus in agreement that the new corporation was to be responsible for the payment of the old corporation's principal indebtedness and its pressing current liabilities, but that the latter, *288 consisting of the accrued interest and back taxes, were to be paid immediately after the formation of the new corporation and the carrying out of the other steps provided in the plan. Such was the situation on or about October 16, 1936, when the petitioner was incorporated. It is true that the resolutions of the corporations referred to the $25,655.77, which was the amount necessary to clear the properties of delinquent interest and taxes, as consideration flowing to Lindley Patrick for its properties and that similar language appeared in the application of petitioner to the California Corporation Commissioner for a permit to issue its stock. The permit as issued indicates, however, that the commissioner interpreted the transaction as meaning that the consideration flowing to Lindley Patrick was the 599 shares of stock, the pertinent language of the permit being that petitioner was authorized "To issue an aggregate of not to exceed 599 shares to Lindley Patrick Farms, Inc., a corporation, in exchange for the property and assets described in its application, first to be transferred and assigned to applicant, subject to liabilities and encumbrances not exceeding in the aggregate $153,809.39." *289 The sum of $153,809.39 represented the total principal indebtedness of Lindley Patrick of $128,153.62 and the $25,655.77 required to pay the delinquent interest and taxes. In the minutes of an adjourned meeting of petitioner's directors, on October 24, 1936, the permit was quoted in full, after which there was recorded the adoption of the resolution directing the issuance to Lindley Patrick of 599 shares of petitioner's capital stock, upon delivery by Lindley Patrick to petitioner of all its real property, situated in San Joaquin County, the five promissory notes, previously described in our findings, and the claim against the City of Stockton. There was no mention of payment to Lindley Patrick of the $25,655.77. It is also to be noted that while the letter by Lindley Patrick to the escrow agent, which was endorsed by Wilhoit, president of petitioner, did carry a statement that the $25,655.77 would be handed to the escrow agent for the account of Lindley Patrick, full instructions as to the use and application of the said amount was included, followed by the further instructions that "after payment of the above amounts, any surplus remaining is to be paid by you to the Stockton Harbor *290 Industrial Company." That on the picture presented the consideration flowing to Lindley Patrick for its properties was the 599 shares of petitioner's stock and the assumption of the principal amount of the notes standing against the properties and the payment of the delinquent interest on those notes and of the delinquent taxes on the properties were by and for the account of petitioner, in our opinion, requires no extended discussion or elaboration. The situation was not one where their payment or nonpayment was a matter of no concern to petitioner, as would have been true if they had been independent or side obligations of Lindley Patrick. To the contrary, the assumption of the payment of the obligations by petitioner was the natural and logical course, and regardless of the formalities of words used at some places in recording the transaction, or of the formalities indulged in in making payment, the facts, in our opinion, show that there was never any thought or intention but that the moneys paid to the escrow agent should be applied to the clearing of the properties petitioner was acquiring of the charges for delinquent interest and taxes and that any balance not so required *291 belonged to petitioner. The escrow agent was acting for both parties and it was never the thought or intention that any part of the $25,655.77 would pass to Lindley Patrick. Cf. Roosevelt Hotel Co., 13 T.C. 399. Petitioner's claim that it acquired the properties of Lindley Patrick not only in exchange for its stock, but also in exchange for the personal loan by Rawlings to Lindley Patrick, is even more unrealistic. The loan stood, so to speak, on its own feet and the consideration for it was the promise of Lindley Patrick to Rawlings to make repayment thereof. It was evidenced by a note or notes of Lindley Patrick and secured by Lindley Patrick's own shares of stock in petitioner. Petitioner, with the loan outstanding or with it paid, was neither richer nor poorer. For the purposes here, we may assume that but for the transaction between petitioner and Lindley Patrick, Rawlings would not have made the loan to Lindley Patrick, but that does not make it a part of the exchange. In New Jersey Mortgage & Title Co., 3 T.C. 1277, there was a reorganization of the transferor corporation. Under the plan, the taxpayer corporation was organized to take over the properties *292 of the old corporation. Among other things, the taxpayer corporation assumed the principal obligation of the old corporation on its bonds, by issuing its own bonds, with a lower rate of interest. The plan was effective May 1, 1937, but interest was paid in cash on the new bonds for the six months period prior to the effective date. It was contended that the exchange was not solely for stock, since the payment of this interest arose out of the plan and was "an inducement to the exchange." The Court held that the exchange was solely for stock, within the meaning of the statute, saying, with respect to the interest payment, "Whatever effect it may have had as an inducement, it was not an obligation of the old corporation liquidated by cash nor did it represent any part of the quid pro quo." The Rawlings loan may have been an "inducement," but it was not a consideration between Lindley Patrick and petitioner for the transfer of the former's properties to the latter. It is accordingly our conclusion that petitioner acquired substantially all of the properties of Lindley Patrick in exchange solely for a part of its voting stock, within the meaning of section 112 (g) (1) (C), supra, and, *293 under section 113 (a) (7), supra, the basis of the properties in its hands was the same as the basis of those properties when they belonged to Lindley Patrick. The remaining issue is whether respondent erred in determining that the gains from the sales of petitioner's real properties were taxable as ordinary income. Petitioner contends that in reporting its gain from the sale of the said properties, it is entitled to the benefits of section 117 (j) of the Code, [2] in that the properties were used in its business. Respondent's position is that exception (B) of subsection (j) is applicable and that during the taxable years involved, petitioner held its properties primarily for sale to customers in the ordinary course of its business, which deprives petitioner of the capital gains benefits of the statute. *294 Petitioner's contention is based on the proposition that it rented some of its property to farming tenants over a long period of time, that it held the property for investment, not primarily for sale, and that it at no time embarked on the active business of a dealer in real estate. In other words, it claims that the facts show exception (B) of section 117 (j) (1) is not applicable because petitioner did not hold its property (1) "primarily for sale," (2) "to customers," or (3) "in the ordinary course of * * * trade or business," the three essential elements of the exception. Petitioner claims that it was incorporated for other business purposes as well as for buying, selling, developing and subdividing its properties, such as leasing, mortgaging and hypothecating properties; acquiring and selling capital stock, bonds and securities of other corporations; borrowing and lending money; transacting any other kind of business that might be beneficial and desirable for the stockholders of the corporation. It points to the renting of much of its properties for farming and to entering into an oil and gas lease, which required the lessee to drill a well and to pay a 20 per cent royalty, *295 as indicating that petitioner's business purpose was other than to sell property to customers in the ordinary course of business. Furthermore, petitioner contends that even if the facts supported the proposition that it acquired the property originally for sale to customers in the ordinary course of its business, that purpose had changed prior to the sales made during the taxable years involved. We are convinced that petitioner acquired its real property in 1936 for the primary purpose of promoting and selling it for industrial use. The specific powers of petitioner as expressed in its articles of incorporation included such purpose. The publicity given to petitioner when it was incorporated indicated such purpose. The display advertisement it later placed in the paper of a neighboring community paying tribute to one of that community's citizens, emphasized the business of petitioner to be "Manufacturing, Industrial, Wharf and Warehouse Sites." The stationery petitioner used, not only expressed the same business purpose in its heading, but displayed on the back side a detailed map, in several colors, of the holdings on and adjoining Rough and Ready Island, in which was depicted "The *296 Company's 1000 acres of Manufacturing, Industrial and Warehouse Sites." Petitioner so indicated such business purpose in its application for a permit to issue its stock and described two of its proposed stockholders, Wilhoit and Rawlings, as businessmen experienced in buying and selling real estate, and Lindley, who had owned the property individually and through Lindley Patrick, which was to be the largest individual stockholder in petitioner, as having "operated the same as farming lands, and subdivided and sold portions for industrial purposes." It was recognized that such industrial development would extend over a long period of time and that it was better not to subdivide the property into tracts because of the varying needs of different industries. The fact that some of the properties were rented to tenants for farming was at all times secondary to its promotion and sale as industrial sites. Certainly the farming of portions of the property in the interval did not interfere with or defeat the primary plan and purpose. Similarly, the giving of the oil and gas lease is of little or no moment here. Assuming that if oil or gas, or both, had been discovered in commercial quantities, *297 the purpose of promoting and selling of the property would have been abandoned, the facts show that the only well drilled was drilled in 1945, and was a dry hole, and so far as appears, that ended any plans for producing oil and gas from the property. The efforts to promote the property as desirable industrial sites continued after the drilling of the dry well, as before. Another important fact that shows that petitioner was holding the property for sale in industrial and other business tracts is the operation of its general manager, Lindley, on the Island. Lindley had envisioned for years the industrial development of the Island, because of its proximity to the Port of Stockton and the deep channel that ran to the port, along the northern boundary of the Island. After petitioner acquired the property, it was through Lindley that prospective purchasers viewed the various sites. He exhibited petitioner's holdings to a real estate firm with an explanation of the purpose of petitioner and the assurance of the usual broker's fee for any sales they might make. The attempts by petitioner, through its general manager or agent, to interest a shipbuilding industry to buy or lease some of its *298 water front property was in line with the primary purpose. The leasing efforts came after efforts to sell at that time had failed. Leasing efforts likewise failed and fall far short of indicating any abandonment of the primary purpose to sell. We recognize, of course, that an established business purpose could be changed. Cf. Carl Marks & Co., 12 T.C. 1196, 1202 change, there should be some definite action to that end. Petitioner, being a corporation, had specific and general powers under which it could engage in different businesses. As pointed out above, it engaged in the business of promoting and selling its property in industrial tracts. It carried on with that purpose, knowing that it would take some time for the property to develop industrially, considering the industrial potentiality of the Stockton area. In 1942, it expressed its business purpose to the revenue agent, in protesting against proposed income tax deficiencies for the years 1939 and 1940, by stating that its "real property was to be offered for sale in parcels for industrial purposes," and that its real properties "are held primarily for sale." It was in 1942 that Lindley, operating from his home *299 on the Island, showed petitioner's property to real estate agents in order to acquaint them with the property and to inform them of the prices at which various parcels were available for sale. Petitioner continued to look with confidence to the future development of industrial sites from its property, as its stationery, as late as November 1944, indicated. It appears that petitioner's original purpose of selling the property in varying parcels to industrial users was never changed. Petitioner seeks to draw support for its position from the claim that it did not advertise the properties for sale and that it did not have a frequency of continuity of sales sufficient to bring it within tests as laid down by the courts to show that it was in the business of selling real estate. No particular test is determinative of our question. It must be decided on the facts of the individual case. W. T. Thrift, Sr., 15 T.C. 366. Petitioner had already received much publicity of its business purpose and of the backing of influential businessmen, well known in the community. It preferred that prospective buyers should personally negotiate with Lindley, its business manager, as had been *300 customary. It was not due to the lack of publicity that the development of the industrial sites was not faster. Nor does the fact that only a few sales were made show that petitioner had given up on the promotion of its property as industrial sites, or that its primary business purpose was changed. The activity of petitioner through its general manager remained the same. Petitioner states that it had no "customers" to whom it could sell, and consequently was not engaged in the business of selling real estate for industrial or other business sites. That statement is based on the few sales that were made. Petitioner's customers were limited to certain business groups, who might have foreseen the growth of Stockton and of its port, and would have wanted sites for factories, industries, wharves, warehouses and the like. Petitioner preferred to deal directly with such prospective purchasers in the manner it chose and though it was successful in making only a sale or two, that did not take its prospects from the classification of "customers" nor change its business purpose. Petitioner continued to hold its real property for sale to customers, when and if they came along to buy. Cf. Jacob S. Gruver, 1 T.C. 1204, *301 affd., 142 Fed. (2d) 363; Walter G. Morley, 8 T.C. 904. We accordingly conclude that the property herein was held by petitioner primarily for sale to customers in the ordinary course of its business, within the meaning of Clause (B) of section 117 (j) (1), supra, and respondent's determination to that effect must be sustained. Decisions will be entered under Rule 50. Footnotes
1. At this point, there is an apparent discrepancy as to dates. It is stipulated that the application was filed October 22, 1936, and that copies of two resolutions of the board of directors were attached. In another place in the stipulation, the date of adoption of the resolutions by the board is stated to have been October 24, 1936.↩
2. SEC. 117. CAPITAL GAINS AND LOSSES. * * *
(j) Gains and Losses From Involuntary Conversion and From the Sale or Exchange of Certain Property Used in the Trade or Business - (1) Definition of Property Used in the Trade or Business. - For the purposes of this subsection, the term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (1), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. Such term also includes timber with respect to which subsection (k) (1) or (2) is applicable. (2) General Rule. - If, during the taxable year, the recognized gains upon sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 month. * * *↩