**Theodore H. CASE, Individually and as Co-Executor of the Estate of Natalie C. Case, Deceased, Hart B. Morrison and Margaret M. Morrison, Plaintiffs-Appellees, Cross-Appellants,**

v.

**UNITED STATES of America, Defendant-Appellant, Cross-Appellee.**

Nos. 78-3330 to 78-3333.

United States Court of Appeals, Sixth Circuit.

Argued June 18, 1980.

Decided Oct. 30, 1980.

Rehearing Denied Dec. 5, 1980.

James R. Williams, U. S. Atty., James C. Lynch, Asst. U. S. Atty., Cleveland, Ohio, David J. Curtin, M. Carr Ferguson, Gilbert Andrews, Mike Paup, Gilbert S. Rothenberg, Tax Div., Appellate Section Dept. of Justice, Washington, D. C., for defendant–appellant, cross–appellee.

Paul A. Weick, Weick & Gibson Co., L. P. A., Cuyahoga Falls, Ohio, for plaintiffs–appellees, cross–appellants in Nos. 78–3330 and 78–3331.

John Kennedy Lynch, Cleveland, Ohio, for plaintiffs–appellees, cross–appellants in Nos. 78–3332 and 78–3333.

Before ENGEL, KEITH, and BOYCE F. MARTIN, Jr., Circuit Judges.

BOYCE F. MARTIN, Jr., Circuit Judge.

This controversy involves two taxpayers' suits for refunds of federal income tax paid for the year 1970. Both the United States and the taxpayers have brought appeals from the judgment of the District Court.

We must determine whether gains realized from the disposition of certain real estate should be characterized as long–term capital gain, short–term capital gain, or ordinary income.

## I. The Facts

On June 1, 1969, taxpayers Morrison and Case formed a partnership. Their purpose was the acquisition of real estate near Geneva, Ohio, in an area adjacent to Lake Erie and Geneva State Park. Long–range plans included transfer of the properties purchased to a corporation, which the taxpayers would form to develop and sell residential units and a recreational complex. An alternate possibility was resale of the properties in bulk to another, larger developer. Taxpayer Morrison had many years experience marketing real estate in Ohio; taxpayer Case was president of the local telephone company and well–qualified to handle arrangements for bringing utilities to the proposed project.

The partnership's first purchase was a 3.8 acre tract located on the shore of Lake Erie near the Geneva State Park boundary. "The Behner property" contained about a dozen summer cottages. By declaration of trust dated June 27, 1969 and a warranty deed of June 30, 1969, Herbert and Nona Behner conveyed the property to the Northeastern Ohio National Bank as trustee for beneficiaries Morrison and Case and their wives. The price was $72,800, which the conveyors received from the bank.

The second acquisition was the "Johnson property," an 8.2 acre tract containing several cottages and a few permanent homes.

It was located west of the Behner property. On February 16, 1970, Morrison and Case contracted to purchase the property from George and Catherine Johnson for a price of $150,000. The taxpayers made a $2,000 down payment and agreed to pay an additional $18,000 on or before July 15, 1970. The balance of $130,000 was due on or before January 15, 1971. The contract provided 1) that title would not be transferred until the purchase price was paid in full; 2) that the taxpayers would obtain possession sixty days after the transfer of title; 3) that in lieu of interest on the deferred payments, the Johnsons would receive all rents and profits from the property until passage of title; and 4) that taxes, assessments and insurance would be prorated between the parties as of the date of transfer.

On March 15, 1970, the taxpayers acquired a third tract from Jack and Inez Nightwine. The Nightwine property adjoined the Johnson property and also contained summer cottages. The partnership obtained, for $64,456.95, the Nightwines' rights under a 1969 purchase contract. Toward that sum, the taxpayers paid $500 on July 20, 1970 and $15,500 on October 15, 1970. They received immediate possession and assumed responsibility for all taxes and assessments.

Morrison, acting individually, contracted to purchase a fourth parcel of land on January 15, 1970. The 162–acre tract had been owned since 1965 by the "B'tawn Beach Club" partnership, consisting of taxpayer Case and his three brothers. Case did not participate in Morrison's purchase of the B'tawn property, apparently because he wished to avoid a conflict of interest.

The B'tawn contract provided for a total price of $425,000, to be allocated among a $10,000 down payment, a payment of $290,000 due on or before December 1, 1970 and a final payment of $125,000 to be made on or before December 31, 1970. Morrison did not, however, adhere to these terms. Instead, upon execution of the contract, he gave the B'tawn partnership a promissory note for $10,000; he did not make payment on the note until November 23, 1970. The B'tawn contract provisions governing deferred passage of title and possession were very similar to those contained in the Johnson contract.

The record indicates that the taxpayers attempted to acquire other property contiguous with the four tracts described above. Mr. Case testified, "you can't sell to some development company in New York and Chicago and have little spots here and little spots there that are missing." At the same time, however, the taxpayers explored the possibility of developing the property themselves; tentative plans called for the formation of a corporation to be financed by outside investors. Toward this end, they engaged an artist to prepare preliminary sketches of the proposed "Shoreland Acres," consulted an engineer, and opened negotiations with utility companies for the provision of services to the project.

On September 22, 1970, the State of Ohio announced that the United States Department of the Interior had approved expenditures of up to $1.5 million for the expansion of nearby Geneva State Park. Shortly thereafter, the taxpayers received notice of the State's intention to acquire the Behner, Johnson, Nightwine, and B'tawn tracts. We outline, briefly, the transactions which followed this notice of condemnation.

On November 27, 1970, the taxpayers instructed the Northeastern Ohio National Bank, as trustee, to grant the State of Ohio a thirty–day option to purchase the Behner property for $175,000. The State exercised this option and on December 7, 1970, the bank transferred title to the State. On December 29, 1970, the State issued a warrant to the bank in the amount of $175,000. The bank discharged the deed of trust on the property and paid the remainder of the $175,000 to the taxpayers.

On November 27, 1970, the taxpayers granted the State a similar option to purchase the Johnson property for $334,000. The State exercised this option on the date it was granted. On December 7, 1970, the Johnsons deeded the property to the taxpayers, who, in turn, transferred title to the State on December 11, 1970. Upon receipt

of $334,000 from the State, the taxpayers paid the Johnsons the approximately $110,000 still owning on the original purchase agreement.

Also on November 27, 1970, the taxpayers granted the State an option to purchase the Nightwine property for $139,000. This sale was completed on December 11, 1970, whereupon the taxpayers paid the Nightwines the remaining balance due of $48,457.

Morrison handled the sale of the B'tawn property in a somewhat different fashion. On December 4, 1970, the B'tawn Beach Club partnership conveyed title of the property to Howard Nazor as trustee for Morrison. Nazor was instructed not to convey title to Morrison until the latter paid the balance of $415,000 due on the original $425,000 price. The deed of trust was recorded December 11, 1970. On December 16, 1970, Nazor, as trustee for Morrison, granted an option to the State to purchase the B'tawn tract for $565,000. On December 17, before the B'tawn Beach Club partnership had received further payment from Morrison, Nazor conveyed both legal and equitable title to the state of Ohio. On December 29, 1970, the State issued a warrant for $565,000 to Nazor, who proceeded to pay the B'tawn Beach Club partnership the balance due on the original contract. He then distributed the remainder to Morrison.

The following chart summarizes the important points in the taxpayers' real estate transactions:

| Property | Initial Contract Date | Cost | Date of Conveyance to State | Selling Price | Gross Profit |
|---|---|---|---|---|---|
| Behner | 6/27/69 | $ 72,800 | 12/ 7/70 | $175,000 | $102,200 |
| Johnson | 2/16/70 | 150,000 | 12/11/70 | 334,000 | 184,000 |
| Nightwine | 3/15/70 | 64,457 | 12/11/70 | 139,000 | 74,543 |
| B'tawn | 1/15/70 | 425,000 | 12/17/70 | 565,000 | 140,000 |
| Totals | | $712,257 | | $1,213,000 | $500,743 |

## II. The Controversy

In their respective income tax returns for 1970, Morrison and Case reported the gains realized from the sales of their properties as long–term capital gains. In the course of an audit, the Internal Revenue Service decided that the gains should have been reported as ordinary income. Accordingly, the Service assessed tax deficiencies against Morrison in the amount of $93,094.62 plus interest, and against Case in the amount of $53,080.56 plus interest. Each taxpayer paid his deficiency in full and filed a timely claim for refund. The Service denied both claims and Morrison and Case initiated separate actions in District Court.

Before the two suits were consolidated the United States filed a motion for partial summary judgment against Morrison. It contended that he had held, for tax purposes, the Johnson and B'tawn properties for less than six months; even if he were entitled to report his gains on the sale of these tracts as capital gains, those gains would be taxable on a short–term rather than a long–term basis. In support of its motion, the United States pointed out that Morrison's tax liability under a short–term capital gain theory would be identical to his liability if the gains were characterized as ordinary income.

The District Court concluded that Morrison had, in fact, held the Johnson property for less than six months; to that extent, it granted the government's motion for summary judgment. *Morrison v. United States*, 449 F.Supp. 654 (N.D.Ohio 1977). The Court declined to rule on the appropriate treatment of Morrison's gain from the sale of the B'tawn property until it heard further evidence.

After trial, for which Morrison's and Case's suits were consolidated, the District Court ruled that the taxpayers' sales of all four tracts generated capital gain and not ordinary income. *Morrison v. United States*, 449 F.Supp. 663 (N.D.Ohio 1977). The Court's reasoning can be summarized as follows: on September 22, 1970, when Morrison and Case received formal notice of the state's intention to acquire their properties, the taxpayers held their real estate for sale in the ordinary course of business; at the time of the actual sales to the state, however, the taxpayers held the properties for investment purposes and therefore realized gain on the disposition of capital assets.

In its discussion of the six–month holding period required for long–term capital gain taxation, the Court ruled that Case's gain on the sale of the Johnson tract and Morrison's gain on the sale of the B'tawn property failed to qualify as "long–term" and were, therefore, subject to "short–term" tax treatment. According to the Court, the taxpayers neither assumed the burdens nor enjoyed the benefits of ownership of these two properties until they actually obtained title to them. As noted above, this event did not take place until a few days before title was conveyed to the State.

The government did not contest that the taxpayers had held the Behner and Nightwine tracts for more than six months. Accordingly, the Court found that the gain realized on the sale of these properties was long–term capital gain and that the taxpayers were entitled to a partial refund.

We believe that the District Court achieved the correct result insofar as it determined the amount of tax Morrison and Case ultimately had to pay. However, we have profound misgivings about the rationale underlying the decision below.

### III. The Issue on Appeal

On appeal, the government contends that the taxpayers held their properties "for sale to customers in the ordinary course of business." If this position is correct, the taxpayers should have reported their gain from the disposition of the properties as ordinary income.

Section 1202 of the Internal Revenue Code (26 U.S.C.) provides preferential tax treatment for long–term capital gain. During the tax year 1970, Section 1222(3) defined long–term capital gain as gain derived from the sale of a "capital asset" held for more than six months. Section 1221(1) offers a negative definition of "capital asset": it is property which does *not* fall within certain enumerated categories, among them "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade of business."

The taxpayers, of course, maintain that none of the exceptions set out in Section 1221(1) apply to the four tracts of real estate described earlier. If they are correct, then their properties were, by definition, capital assets. Furthermore, argue the taxpayers, for purposes of federal taxation, they "held" all four properties for more than six months and were therefore entitled to report their gains as long–term capital gains.

In our review, we adhere to the rule that the preferential capital gains provisions in the tax code are to be narrowly construed. *Corn Products v. Commissioner*, 350 U.S. 46, 52, 76 S.Ct. 20, 24, 100 L.Ed. 29 (1955); *Omer v. United States*, 329 F.2d 393, 395 (6th Cir. 1964). In consequence, the taxpayers must overcome a heavy burden of proof in order to prevail.

### IV. The Standard of Judicial Review

The government contends that we need not confine ourselves to a "clearly erroneous" standard of review in this case. In support of its position, it cites Third, Fourth, and Fifth Circuit decisions which indicate that the determination of whether the taxpayers held their properties "for sale in the ordinary course of business" is one of law, or "ultimate fact." *Jersey Land and Development Corp. v. United States*, 539 F.2d 311, 315 (3rd Cir. 1976); *Turner v. Commissioner*, 540 F.2d 1249, 1252 (4th Cir. 1976); *Biedenharn Realty Co. v. United States*, 526 F.2d 409, 416 (5th Cir. 1976). This characterization of the issue, in effect, permits an appellate court to re–examine the evidence without giving customary deference to the original findings of the trial court.

The authorities cited by the government are undoubtedly well–reasoned; however, we are resolved to adhere to the principles expressed in *Philhall v. United States*, 546 F.2d 210, 214 (6th Cir. 1976), and, most recently, in *Gartrell v. United States*, 619 F.2d 1150 (6th Cir. 1980). We held in those cases that the determination of whether property is held "primarily for sale" depends entirely upon judicial ascertainment of the taxpayer's intent. It is, therefore, an ordinary issue of fact, subject to reversal on appeal only if we believe the District Court's findings were "clearly erroneous."

## V. Review of Authorities

The District Court found: 1) that the taxpayers held their properties primarily for sale to customers in the ordinary course of business; 2) that the threat of condemnation changed this purpose; but 3) that the taxpayers held the Johnson and B'tawn tracts for an insufficient period of time to qualify for long–term capital gains treatment.

The taxpayers maintain: 1) that there was no evidence to support the District Court's first finding; 2) that the threat of condemnation confirmed the "capital" nature of their gains from sale of the properties; and 3) that they held the Johnson and B'tawn tracts for more than six months. They offer several arguments in support of the third assertion: first, that Ohio law of equitable conversion substantiates their claim to a sufficient holding period; second, that they obtained the "benefits and burdens of ownership" more than six months prior to the state's purchases; and third, that the purchase contracts gave them "options" within the meaning of Section 1234(a) of the Code.

### A. The purpose for which the taxpayers held their properties.

■ In *Matthews v. Commissioner*, 315 F.2d 101, 107 (6th Cir. 1963), we enumerated eight factors to consider .in deciding whether property is held "primarily for sale." They are: 1) the purpose for which the property was acquired; 2) the purpose for which the property was held; 3) the extent of improvements made to the property; 4) the frequency, number, and continuity of sales; 5) the nature and substantiality of the transactions; 6) the nature and extent of the taxpayer's dealings in similar property; 7) the extent of advertising to promote sales; and 8) whether or not the property was listed for sale either directly or through brokers. *See also Broughton v. Commissioner*, 333 F.2d 492, 495 (6th Cir. 1964); *Gartrell v. United States, supra* at 1155–56.

■ In this case, the taxpayers testified that they acquired the properties in order to "hold ... and develop" them. As we have already noted, they hoped to transfer the properties to a corporation, to be financed and fifty percent owned by two outside investors. The government, in its argument, emphasizes repeatedly that this plan to transfer the real estate to a corporation *at costs* negates any investment motive on the taxpayers' part. This interpretation ignores that aspect of the proposed transfer *which represents, quite simply, sound tax planning.* Transfer of the properties at cost instead of at an appreciated figure would have the effect of postponing recognition of a taxable gain. That the taxpayers intended to use this legitimate means of avoiding an imminent tax scarcely obviates the possibility that they did, in fact, regard their properties as an investment.

Furthermore, the taxpayers did not make improvements to any of the properties; they merely maintained them in their existing condition. The properties were neither advertised nor listed for sale, and no sales in fact occurred until the state issued its condemnation notices.

The District Court was impressed with Morrison's considerable experience in marketing Ohio real estate; it apparently inferred from his background that he was holding these *particular* properties primarily for sale. The government introduced no evidence whatsoever to support such a finding–a significant omission, since the Code specifically contemplates that dealers may segregate certain transactions in property similar to their stock in trade in order to qualify for capital gains tax treatment. 26 U.S.C. § 1236(a). *Buono v. Commissioner*, 74 T.C. No. 15, 1980 Tax Ct.Rep., Dec. 36,-925; *Boykin v. Commissioner*, 344 F.2d 889, 894 n. 8 (5th Cir. 1975).

In light of tne foregoing observations, we are constrained to hold that there was insufficient evidence to support the District Court's conclusion that the taxpayers' properties were held "primarily for sale." *Cf. Appeal of Bush*, 610 F.2d 426 (6th Cir. 1979).

B. The effect of the threat of condemnation.

The District Court found that the taxpayers changed their purpose in holding the properties; under threat of condemnation, they became investors holding capital assets. The .Court based its decision on *Ridgewood Land Co., Inc. v. Commissioner,* 477 F.2d 135 (5th Cir. 1973); *Commissioner v. Tri–S Corp.,* 400 F.2d 862 (10th Cir. 1968); and a Tax Court case, later reversed as *Juleo, Inc. v. Commissioner,* 483 F.2d 47 (3rd Cir. 1973).

Our reversal of the District Court's ruling that the taxpayers initially held their property "primarily for sale" eliminates the need to consider the effect of the condemnation notice on these particular litigants. In view of the approach taken below, however, we wish to clarify our position on the legal issue lest this case engender confusion in future cases before the courts of this Circuit.

■ We agree with the Third Circuit's rationale for reversing the Tax Court in *Juleo, Inc., supra*; as a corollary, we reject the suggestion that, for federal tax purposes, mere receipt of a condemnation notice automatically transforms property held "primarily for sale" into investment property. As the government notes in its brief, any property owner who receives a notice of condemnation presumably abandons whatever plans he originally entertained in favor of a new, albeit temporary, reason for holding the condemned property. Common sense application of established tax principles mitigates against giving this circumstance conclusive effect.[1] Except as specif-

ically provided by statute, *cf.* 26 U.S.C. § 1033, we decline to determine the tax consequences of a sale solely on the strength of a finding that the sale was involuntary.

Ordinarily, the characterization of an asset as "capital" or "non–capital" requires an analysis of several factors; the preceding section of this opinion illustrates just such an exercise. The addition of a condemnation notice to this calculus merely injects one more element to be considered; it does not eliminate the calculus altogether.

C. Whether the taxpayers held the B'tawn and Johnson properties for the six–month period prerequisite to preferential long–term capital gain treatment.

On appeal, the taxpayers argue that the District Court erred in concluding that gains realized on the sale of the B'tawn and Johnson properties were ineligible for taxation at the long–term capital gain rate.

They argue, first, that Ohio law of equitable conversion substantiates their claim to a sufficient holding period. Generally speaking, "State law determines what property rights and interests a taxpayer has, but federal law determines the consequences of such rights and interests for tax purposes." *Cotnam v. Commissioner,* 263 F.2d 119 (5th Cir. 1959).

■ The state law argument can be summarized as follows: in Ohio, the principle of equitable conversion invested the taxpayers with an equitable interest in the two properties. We are asked to treat this equitable interest as a capital asset which, when sold, yielded capital gains. The taxpayers assert that they obtained this equitable interest at

---

1. The District Court's approach is logically inconsistent with the treatment the tax laws accord judicially enforceable payments in general, and condemnation proceeds in particular. Thus, amounts received in settlement of a claim for lost profits are taxable as the profits would have been taxed, as ordinary income. *Raytheon Production Corp. v. Commissioner,* 144 F.2d 110 (1st Cir.), *cert. denied,* 323 U.S. 779, 65 S.Ct. 192, 89 L.Ed. 622 (1944). If the claim is for damage to a capital asset, the amount received in settlement is treated as a return of capital, taxable at capital gain rates if the recovery exceeds the asset's basis. *Farm-*

*ers & Merchants Bank v. Commissioner,* 59 F.2d 912 (6th Cir. 1932).

With respect to condemnation proceeds, the Code envisions the possibility of ordinary income treatment of gain realized on condemnation of inventory. Section 1231(a) provides in part for capital gain treatment of gains recognized upon condemnation of "property used in the trade or business." Section 1231(b)(1)(B), which defines such property, however, provides as well that real estate which is held primarily for sale cannot qualify for capital gain under Section 1231.

the time they signed the purchase contracts for the two tracts, more than six months prior to disposition of the properties.

This argument is undoubtedly ingenious; however, Ohio case law does not support its application to the present facts. We quote from *Sanford v. Breidenbach*, 111 Ohio App. 474, 173 N.E.2d 702 (1960): "Equitable conversion does become effective in those cases in which the vendor has fulfilled all conditions and is entitled to enforce specific performance, *and the parties, by their contract, intend that title shall pass upon the signing of the contract of purchase.*" (Emphasis added.)

The B'tawn and Johnson contracts, described in Part I of this opinion, clearly intended no such result; on the contrary, the sellers specifically reserved title to the property until they received payment in full. Since payment took place only days before disposition of the properties, the taxpayers' reliance on the principle of equitable conversion is misplaced.

In the alternative, the taxpayers advance the "practical" test announced by this Court in *Commissioner v. Baertschi*, 412 F.2d 494 (6th Cir. 1969); and *Dettmers v. Commissioner*, 430 F.2d 1019 (6th Cir. 1970). In those cases we held that "ownership of real property is acquired either upon delivery . . . of the deed or upon transfer of the benefits and burdens of ownership, whichever occurs first." *Dettmers, supra* at 1023. The taxpayers point to the fact that they maintained the properties and, in the case of the Johnson tract, applied rental income to offset the interest owed the Johnsons; from this, they ask us to infer "benefits and burdens of ownership" of a character sufficient to sustain a favorable ruling. Again, however, the purchase contracts are clear. Virtually all the "benefits and burdens of ownership" remained in the vendors until the purchase price was fully paid.

Finally, the taxpayers contend that the purchase contracts created options to buy. 26 U.S.C. § 1234(a) accords gains or losses from "privileges or options to buy" the same tax treatment as the property subject to those options. Inasmuch as the properties themselves would have been cap-

ital assets in the taxpayers' hands, they urge us to treat these "options" as we would treat the underlying properties. The "options" the taxpayers claim to possess would, of course, date back to the signing of the purchase contracts.

Our review of the meaning of an "option" for purposes of Section 1234 convinces us that the taxpayers did not, in fact, possess "options" within the meaning of the statute. What they did possess were bilateral contract rights, to which Section 1234 does not, by its terms, apply. In a scholarly analysis of this issue, the Court of Claims examined the language, legislative history, and Revenue Rulings pertinent to Section 1234; it concluded that an "option" is, for purposes of the statute, a very narrow concept. *United States Freight Co. v. United States*, 422 F.2d 887, 894–5, 190 Ct.Cl. 725 (1970). We agree, and affirm the District Court's decision against the taxpayers' claim to a six–month holding period.

### VI. Conclusion

As we have already noted, this opinion modifies the rationale but not the actual result of the trial court's decision. The District Court's order directing the government to issue the taxpayers a partial refund of federal income taxes, is therefore, affirmed.