WILLIAM B. DAUGHERTY AND CHARLOTTE G. DAUGHERTY,
PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket No. 21161–80.      Filed April 15, 1982.

*Joshua W. Miles*, for the petitioners.
*John F. Dean*, for the respondent.

DAWSON, *Judge*: Respondent determined the following deficiency in and additions to petitioners' Federal income taxes:

| Year | Deficiency | Addition to tax sec. 6653(a)[1] |
|------|-----------|----------------------------------|
| 1975 | $42,940.64 | None |
| 1976 | None | $147.64 |
| 1977 | None | 109.86 |

The principal issue is whether the gain received by petitioners in 1975 from the State of Maryland incident to the condemnation of land owned by them adjacent to Janes Island State Park is taxable as ordinary income or as capital gain. The resolution of this issue depends upon whether the petitioners were holding the property for sale to customers in the ordinary course of their business immediately prior to receiving the notice of condemnation and, if so, whether the condemnation notice, ipso facto, negated their intent to hold it for sale in the ordinary course of their real estate business and changed their intent into an investment purpose. A secondary issue is whether the petitioners' underpayments of tax for 1976 and 1977 were due to negligence or intentional disregard of rules and regulations.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

William B. Daugherty and Charlotte G. Daugherty (petitioners) are husband and wife who resided in Crisfield, Md., when they filed their petition in this case. They filed their joint Federal income tax returns for the years 1975, 1976, and 1977 with the Internal Revenue Service Center at Philadelphia, Pa.

William B. Daugherty (herein referred to individually as petitioner) has been in the real estate business (sales and rentals) since 1964 when he purchased a tract of land consisting of about 52 acres known as Heart's Ease. That property was subdivided with the intent to sell individual lots to customers in the ordinary course of business. About 30 lots of the Heart's Ease property have been sold.

Petitioner reported on Schedule C of his joint Federal income tax returns, as ordinary income from the sale of

[1]All section references are to the Internal Revenue Code of 1954 as amended and in effect for the years in issue, unless otherwise indicated.

property to customers in the ordinary course of his business, the proceeds from the sale of lots making up the property known as Heart's Ease. In addition, petitioner has sold other miscellaneous properties to customers in the ordinary course of his business, the proceeds from which he reported on Schedule C of his Federal income tax returns.

In 1966 or 1967, the petitioners purchased 12 acres or less of waterfront property on which four log cabins were built for rental primarily during the summer season. One of these lots was sold at a profit to petitioners' former accountant, Richard Jones.

In June 1968, the petitioners purchased property consisting of 22.78 acres of land on the north side of Janes Island State Park (hereinafter referred to as the Janes Island property). This was unimproved waterfront land adjacent to Janes Island State Park. They paid $11,000 for it.

Petitioners have not substantiated the manner of purchase of the Janes Island property, i.e., whether by cash, check, or whether it was financed in whole or in part.

Within the 12 months following the purchase of the Janes Island property, the petitioners began development activities. On or about May 30, 1973, they recorded a subdivision plat with the Board of County Commissioners of Somerset County, Md., and the Somerset County Planning and Zoning Commission.

On or about March 11, 1974, the State of Maryland, Department of Natural Resources, filed a petition for condemnation against petitioners to acquire the Janes Island property, although petitioners had received official notice that the State of Maryland wanted the property at least 1 year prior to the initiation of the condemnation suit.

During the course of the condemnation proceedings, the State of Maryland propounded interrogatories which were answered by the defendants (petitioners here) in the condemnation suit.

The highest, best, and most profitable use of the Janes Island property at and just before its condemnation was for subdivision and lot sales.

During the condemnation proceedings, the petitioners valued the Janes Island property on the basis of the total proceeds they would receive by selling it on a per lot basis.

In April 1975, the parties in the condemnation suit reached a basis for settlement pursuant to which, in the year 1975, petitioners received $165,000 from the State of Maryland as proceeds for the sale of their Janes Island property.

Petitioner felt he had no recourse but to accept the State's settlement offer because the bank was "breathing down [his] neck" for some money, and he had to pay the bank.

Petitioners' 1977 Federal income tax return was prepared by Brooks L. Sterling, Sr., an accountant. During the audit of petitioners' taxable years 1975, 1976, and 1977, Mr. Sterling was employed as their accountant. He also represented them during the examination of their 1978 Federal income tax return.

Under the method of accounting used by petitioners, no balance sheet was maintained showing the purpose for which a piece of property was purchased or was being held.

Petitioners accounted on the cash method for property other than property carried as "inventory," and property accounted for on the cash method was expensed by them in the current year.

The Janes Island property was not expensed by petitioners in the year 1968 when purchased. Instead, it was treated as inventory.

The examining agent for the Internal Revenue Service was not advised that the Janes Island property was to be used as rental property until after petitioners had retained legal counsel.

During the examination of petitioners' returns for the years 1975, 1976, and 1977, petitioner told the examining agent that when the State of Maryland contacted him about condemning the property, the community knew about it right away, it clouded his title, and he was not able to make any sales after that time.

During the audit examination, while on a physical tour of the Janes Island property, petitioner advised Revenue Agent Daniel Duffy that he could have sold the property 30 times over. He also advised the agent that in his type of business in a small community, it is not necessary to advertise.

Petitioners deducted as a cost of sales in their real estate business the principal payments on loans made to purchase real estate. The deduction of principal payments as a cost of

sales was not determinable from the petitioners' books alone but required, in addition, the examination of bank statements or loan schedules.

In a letter dated November 23, 1977, to respondent, the petitioners admitted that they were dealers in real estate and that they had reported half the proceeds of the condemnation on their 1976 Federal income tax return as real estate business income. In 1978, the petitioners filed an amended Federal income tax return for the year 1976 claiming a refund based upon the alleged erroneous inclusion, as ordinary income, of half the condemnation proceeds from the sale of the Janes Island property.

Petitioners did not maintain records segregating property by category of investment, use in business, or property held for sale to customers in the ordinary course of business. Nor did they maintain books or records indicating that the Janes Island property was being held for investment purposes or for use in their business.

Of eight miscellaneous parcels of property purchased, petitioner stated that all which remain unsold are being held for investment. However, the actual sales of portions of the eight miscellaneous properties were treated by petitioners as having been held in the ordinary course of business, and they reported the sales proceeds as ordinary income on their joint Federal income tax returns.

## ULTIMATE FINDINGS OF FACT

(1) Immediately prior to receiving notice of the intent of the State of Maryland to condemn the Janes Island property, the petitioners were holding such property for sale to customers in the ordinary course of their business.

(2) Part of the underpayments of tax for the years 1976 and 1977 were due to petitioners' negligence or intentional disregard of rules and regulations.

## OPINION

### Issue 1. Taxability of Gain From Condemnation Sale

Petitioners realized gain from the condemnation by the State of Maryland on the sale of their Janes Island property. We must decide whether the gain received on the disposition of

the property is taxable to petitioners as ordinary income or as a capital gain.

Section 1202 provides favorable tax treatment for a long-term capital gain which, during the year 1975, was defined in section 1222(3) as gain derived from the sale or exchange of a capital asset held for more than 6 months. Section 1221 first defines the term "capital asset" as "property held by the taxpayer (whether or not connected with his trade or business)" and then excludes certain types of property from capital asset status. The first two statutory exceptions are:

(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

(2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business;

In addition, section 1231(a) provides that under certain circumstances, the proceeds from the involuntary conversion of property used in the trade or business and capital assets held for more than 6 months shall be considered as a long-term capital gain. But section 1231(b) provides that the term "property used in the trade or business" does not include "property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year" or "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business."

The purpose of the exceptions specified in section 1221(1) and (2) is to differentiate gains derived from the everyday operation of a business from those derived from appreciation in value over a substantial period of time. *Malat v. Riddell*, 383 U.S. 569, 572 (1966). As used in section 1221(1), the word "primarily" means "of first importance" or "principally." *Malat v. Riddell, supra* at 572. Whether a taxpayer holds property as a capital asset or for sale to customers in the ordinary course of business is basically a question of fact. *Bauschard v. Commissioner*, 279 F.2d 115, 117 (6th Cir. 1960), affg. 31 T.C. 910 (1959); *McManus v. Commissioner*, 583 F.2d 443 (9th Cir. 1978), affg. 65 T.C. 197 (1975). However, the Court of Appeals for the Fourth Circuit, to which an appeal of this case would lie, may have a different standard because it has

stated that it "will apply the clearly erroneous rule to the Tax Court's resolution of *subordinate facts*, but we will accept the Commissioner's invitation to treat the *ultimate conclusion* to be drawn from those facts as a question of law." *Turner v. Commissioner*, 540 F.2d 1249, 1252 (4th Cir. 1976). (Emphasis supplied.)

To decide whether particular property is a capital asset, courts have considered several factors:

(1) the nature and purpose of the acquisition of the property and the duration of the ownership; (2) the extent and nature of the taxpayer's efforts to sell the property; (3) the number, extent, continuity and substantiality of the sales; (4) the extent of subdividing, developing, and advertising to increase sales; (5) the use of a business office for the sale of the property; (6) the character and degree of supervision or control exercised by the taxpayer over any representative selling the property; and (7) the time and effort the taxpayer habitually devoted to the sales.* * * [*United States v. Winthrop*, 417 F.2d 905, 910 (5th Cir. 1969).]

These factors, however, have no independent significance and only form a part of the entire situation presented.

The purpose for which a taxpayer holds property at a particular time is, of course, subject to change. But generally it is the *purpose* for which property is held *at the time of sale* that determines tax treatment. *Biedermann v. Commissioner*, 68 T.C. 1, 11 (1977); *Eline Realty Co. v. Commissioner*, 35 T.C. 1, 5 (1960). While such purpose is determinative, this Court can and does look at earlier events to decide precisely what that purpose was when the sale was consummated. *Maddux Construction Co. v. Commissioner*, 54 T.C. 1278, 1284 (1970).

## A. Purpose for Holding Property
### Prior to Condemnation Notice

Where, as here, there is a condemnation sale of property, we think it is important to determine first the taxpayer's purpose for holding the property immediately prior to the receipt of the notice of condemnation. *McManus v. Commissioner*, 65 T.C. at 214–216.

Initially, we have approached such issues against the backdrop of the Supreme Court's admonition that courts should narrowly construe the definition of a capital asset and, as a corollary, to interpret its definitional exclusions broadly. *Commissioner v. P. G. Lake, Inc.*, 356 U.S. 260 (1958); *Corn*

*Products Refining Co. v. Commissioner*, 350 U.S. 46 (1955); *Kieselbach v. Commissioner*, 317 U.S. 399 (1943). The burden of proof is on the petitioners to establish that the sale of the Janes Island property to the State of Maryland is entitled to be subjected to capital gains treatment. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.

Using the factors of the *Winthrop* case as guidelines, and viewing the facts of this case in particular, we think the petitioners have failed to carry their burden of proving that respondent's determination was incorrect. Their case is based almost entirely on the testimony of petitioner William B. Daugherty. He testified that he purchased the Janes Island property with the intent to develop it by building log cabins to be held out as vacation rental units, similar to other property on which he has built four such cabins. He also testified that the lot sales prices he made on the copy of the plat of the Janes Island property, which he presented to the revenue agent during the audit, were merely for the purpose of establishing the value of the property for purposes of the condemnation proceedings; that he never intended to sell the property; that he did not make any sales of the property; and that he never advertised the property for sale.

We reject the petitioner's testimony that his intent from the time of purchase was to develop the Janes Island property by building vacation cabins for rental on it. In our judgment, this assertion is not supported by the record. It was first made by the petitioner near the end of the audit examination and after retaining legal counsel. On their Federal income tax return for 1976, the petitioners reported half of the condemnation proceeds as ordinary income from the sale of property in the ordinary course of their business. In a letter dated November 23, 1977, the petitioners advised the respondent that, although they had reported a portion of the condemnation proceeds on their 1976 return as income earned from being a dealer in real estate, they were going to try to take advantage of the reinvestment provisions of section 1033 with respect to 1977, the subsequent year. In 1978, they filed an amended return for 1976 to accomplish the purpose stated in their prior letter. That is what triggered the examination of their returns for the years 1975 through 1978. Surely, if petitioners intended, as

they now claim, to hold the Janes Island property either as an "investment" or for "use in a trade or business," they would not have reported any of the proceeds as ordinary income from a trade or business.

Certainly an important way of determining a taxpayer's intent in holding property, especially when he is, like petitioner, in the business of buying and selling real estate, is to examine how particular property was handled on his books and records.[2] Here, Brooks L. Sterling, the petitioner's accountant during the examination of the years at issue, testified that he examined the petitioner's books and records. When questioned about the Janes Island property, Mr. Sterling stated that the petitioner's method of accounting did not include the use of a balance sheet. Mr. Sterling indicated that petitioner did not have any records showing a separation of various properties according to the purpose for which they were held except that inventory property was not currently expensed. Mr. Sterling then indicated that the Janes Island property was an inventory item because it was "never written off." These statements were made under oath in a deposition taken on August 24, 1981. Later, on September 19, 1981, Mr. Sterling, after reviewing his testimony and considering its

---

[2]See Goggans & Englebrecht, "Investors vs. Dealers," 9 J. Real Est. Tax., No. 2, p. 169, where the authors commented at p. 175:

"Generally, the same considerations apply to dealers as to investors in determining the propriety of capital gain treatment—that is, whether any improvements were made, lack of sales and promotional effort, etc. *However, a dealer is subject to a greater burden of proof.* In addition, the fact that the property differs in some substantial respect from the property in which he normally deals in is important. *Segregation of the property on his books and records is also important for the dealer in support of his obtaining capital gain treatment.*

"A dealer in real estate will have to overcome the presumption that a particular sale is not a further extension of his selling activities. *The presumptions against a dealer holding real estate as an investment asset are so great as to make it absolutely essential that he fully document his intention to hold a particular tract as an investment.* It is necessary that subsequent actions and activities sustain that intent. Thus, segregation of a tract as investment real estate, if coupled with active improvement and development activity, would probably not qualify the tract as a capital asset. On the other hand, a purchase of a parcel which is segregated on the accounting records from development real estate, or as to which letters and other documents indicate an intent to hold the parcel as an investment would support the position that parcel is a capital asset. In addition to documenting the intent to hold real estate as an investment, *the dealer should obtain record title and maintain it separately from other of his properties. He should also make appropriate entries in the books of account so as to distinguish the "investment" property from his inventory holdings.* Moreover, *he should always capitalize expenses incident to such investment property* rather than attempt to deduct such expenses as part of any business associated with real property."

[Emphasis supplied.]

consequences, initiated changes in his deposition stating that he "should have said investment instead of inventory." However, in the same deposition, on pages 5 and 8 of Exhibit 11, Mr. Sterling gave testimony which would lead one to believe that the first time he was apprised of the fact that the Janes Island property was being held for investment purposes was when the petitioner made such a statement in the presence of the examining agent in 1979.

Accepting either the accountant's initial testimony that the property was carried as inventory, or the corrected testimony as to what the accountant "should have said" about the property's being held for "investment," it is clear that the property was not (as testified to at trial) being held for "use in a trade or business." Where the petitioner's books and records make no distinction as to the manner of holding the property, that is a factor indicative of, in the case of a dealer in real estate, holding the property for sale to customers in the ordinary course of business. While it is true that one can be in the real estate business with certain properties and at the same time hold other properties for investment, it is incumbent upon such a real estate dealer to make a clear distinction on his books and records of the various properties held by him and, where he fails to make such a segregation, he is subject to ordinary income treatment for sales or dispositions of such property. See *Pritchett v. Commissioner*, 63 T.C. 149 (1974); *Jones v. Commissioner*, 209 F.2d 415 (9th Cir. 1954), affg. a Memorandum Opinion of this Court.

Of course, the best evidence of how the property was carried on the books and records of petitioner would be the books and records themselves. Just prior to trial, the petitioner's books and records were located in his possession. They were not produced at the trial, thus creating the inference to be drawn that if they had been produced, they would have been adverse to the position taken by petitioners herein. See *Estate of Ridgely v. United States*, 180 Ct. Cl. 1220 (1967); cf. *Steiner v. Commissioner*, 350 F.2d 217, 222–223 (7th Cir. 1965).

At first blush, the lack of advertising of the property and the lack of sales of lots seem to indicate that the property was not being held for sale to customers in the ordinary course of business. However, where advertising appears to be unnecessary, the lack of advertising is not probative of the fact that a

taxpayer is not holding property for sale in the ordinary course of his business. *Biedenharn Realty Co. v. United States*, 526 F.2d 409, 418 (5th Cir. 1976). Petitioner admitted that in a small community, like the one in which he lives, formal advertising is usually not needed since the information is passed by word-of-mouth. Furthermore, the petitioner admitted to respondent's examining agent that he could have sold the Janes Island property "30 times over." Thus, .with such demand for the property, we are satisfied that no formal advertising was necessary.

Petitioner's statement that no parcels of the property were sold is obviated by the fact that it was condemned by the State of Maryland before it was fully developed. In this respect, the petitioner acknowledged that when the State of Maryland contacted him concerning its desire to obtain the Janes Island property, the community knew about it, the title to the property was clouded, and he was not able to make any sales after that time. We are not persuaded that when the petitioner dealt with the Janes Island property he was wearing the hat of an "investor" rather than that of a "dealer."[3] *Maddux Construction Co. v. Commissioner*, 54 T.C. 1278, 1284 (1970). Rather, we are convinced that the petitioner held the property for sale to customers in the ordinary course of business immediately prior to receiving notice from the State of Maryland of its intent to condemn it.

## B. Effect of Condemnation Notice on Purpose for Holding Property

Having reached the ultimate conclusion, based upon the subordinate facts herein, that immediately prior to receipt of the condemnation notice, the Janes Island property was being held for sale to customers in the ordinary course of petitioner's business, we are confronted squarely with the issue as to whether the receipt of the notice of the State of Maryland's intent to condemn the Janes Island property automatically

---

[3]It is significant, we think, that the amounts paid by the State of Maryland for the lots in the Janes Island property represented virtually the same amounts which would have been paid to petitioners by nongovernmental customers who were in the market for choice lots of subdivided waterfront land. *McManus v. Commissioner*, 65 T.C. 197, 216 (1975), affd. 583 F.2d 443 (9th Cir. 1978).

negated the intent of petitioners to hold the property for sale in the ordinary course of their real estate business for Federal income tax purposes.

The resolution of this issue by the courts has been inconsistent and tortuous. The early section 1221(1) condemnation cases, while recognizing and discussing several evidentiary factors, did not recognize the condemnation, itself, as a possible cause of the taxpayer's alleged change in purpose. In *Stockton Harbor Industrial Co. v. Commissioner*, 216 F.2d 638 (9th Cir. 1954), affg. a Memorandum Opinion of this Court (11 T.C.M. 364, 21 P-H Memo T.C. par. 52,103 (1952)), this Court applied the usual tests and found that property sold to the U.S. Navy after condemnation was held primarily for sale to customers in the ordinary course of the taxpayer's business. We considered statements made by the taxpayer in its articles of incorporation and in a letter to the Internal Revenue Service, as well as in advertising and on its corporate stationery, in determining that the property had been acquired and held for the purpose of developing and selling it as industrial sites. We acknowledged that an established business purpose could be changed, but held that no such change had occurred. We made no distinction between a possible change of intent prior to the time the taxpayer learned of the Navy's interest in the real estate and one made as a result of either the threatened or actual condemnation. In fact, we never discussed the effect of the condemnation on the intention of the taxpayer. In affirming our decision, the Court of Appeals for the Ninth Circuit merely declared that our findings could be reversed only if there was no substantial evidence to support them. Eleven years later, in *Commissioner v. Pontchartrain Park Homes, Inc.*, 349 F.2d 416 (5th Cir. 1965), affg. T.C. Memo. 1963–92, this Court again did not discuss directly the effect of a threatened condemnation. The taxpayer was a corporation engaged in the business of developing raw land for sale to individuals in the form of improved lots either with or without houses. When the taxpayer had developed about half of its 211-acre tract and had temporarily ceased development of the remaining portion because of adverse physical and economic conditions, a 17-acre tract of raw land was sold to the State board of education. We held that the raw land was held as an investment when it was acquired and

continued to be so held until it was developed to the point where it could be sold to customers. At that point, it became inventory property, the sale of which would produce ordinary income. Consequently, we decided that since the 17-acre tract sold to the State board of education had never been developed, it remained an investment and its sale produced a capital gain. The Court of Appeals for the Fifth Circuit affirmed our decision per curiam. Thus, both *Stockton Harbor* and *Pontchartrain Park Homes* did not deal with the condemnation itself and with the effect it might have on the purpose for which the property was held.

*Tri-S Corp. v. Commissioner*, 48 T.C. 316 (1967), affd. on other grounds 400 F.2d 862 (10th Cir. 1968), marked the first recognition by this Court that a condemnation notice caused the taxpayer to change the purpose for which the property was held and resulted in a sale which is outside of and unrelated to the ordinary course of the taxpayer's business. In that case, we found that the property had been acquired as raw land with the intention of developing and improving it for ultimate sale as lots with houses. Until the date of the notice that a 20-acre tract was to be condemned, the property was held primarily for sale to customers in the ordinary course of the taxpayer's business. However, we concluded that when the condemnation notice was received, its purpose had to be abandoned because the property would necessarily be acquired by the State; therefore, the property was no longer held for sale to customers. Hence, this Court established in *Tri-S* a per se rule by holding that a condemnation notice changed raw land held primarily for sale to customers in the ordinary course of business into a capital asset. The Court of Appeals for the Tenth Circuit, however, affirmed on the ground that the taxpayer never held the land in question for sale in its raw state to customers in the ordinary course of its trade or business. In doing so, it expressed no view with respect to our rule or reasoning.

Next, we dealt with the condemnation issue in *Juleo, Inc. v. Commissioner*, T.C. Memo. 1971–68, revd. 483 F.2d 47 (3d Cir. 1973), and *Ridgewood Land Co. v. Commissioner*, T.C. Memo. 1972–16, affd. per curiam 477 F.2d 135 (5th Cir. 1973). In discussing the effect of the condemnation notice, we followed our *Tri-S* opinion in both *Juleo* and *Ridgewood* and concluded

that the taxpayers no longer held their property for sale to customers after they had received notice of the impending condemnations. In our *Juleo* opinion, we said (30 T.C.M. at 286, 40 P-H Memo T.C. par. 71,068 at 302-71):

> We regard the holding of the *Tri-S Corp.* case as determinative of the issue now before us. After the condemnation notice in this case, petitioner no longer held the 16.5 acre tract primarily for sale to customers in the ordinary course of its trade or business, and the property sold to the State of New Jersey was a capital asset at the time of its sale.

In our *Ridgewood* opinion, we regarded "the rationale and holding in *Tri-S Corp.* to be determinative of the instant case." 31 T.C.M. at 47.

Both the *Juleo* and the *Ridgewood* decisions were appealed, the *Ridgewood* appeal having been decided first. The Court of Appeals for the Fifth Circuit followed our reasoning in *Ridgewood* and affirmed per curiam. The Third Circuit, in a divided opinion, reversed our *Juleo* decision and declared that reliance on *Tri-S* was erroneous. It made the following statements (483 F.2d at 49):

> A condemnation notice does not change land held primarily for sale to customers in the ordinary course of business into a capital asset. See Stockton Harbor Industrial Co. v. CIR, 216 F.2d 638 (C.A. 9 1954).
>
> Further, if there had been no condemnation, the land which was part of the development would have been sold as such and the proceeds treated as ordinary business income. When the condemnation took place, the owner sought to establish a value, for purposes of the condemnation award, that reflected what the owner would have received if the land had been sold as developed. Consequently, to treat the income actually received, which in large part reflected the intent and plan of the owner, as capital gains rather than ordinary income would appear to be inequitable. What development occurred on the remainder of the 100 acres prior to notice of condemnation necessarily enhanced the value of the 16 acres condemned. This is illustrated by the fact that the pro-rated purchase price of the 16 acres was $10,032.62 and the condemnee received $97,650.63. In view of the present concern about the uneven impost of the tax laws, it does not appear warranted to interpret the law in such manner as to confer still another benefit not clearly mandated by the statute and regulations, and as stated above, there is no case authority for doing so. * * *

After the Third Circuit's reversal of *Juleo*, this Court decided *McManus v. Commissioner*, 65 T.C. 197 (1975), where it was found that the partnership of McManus, Gutleben & Chick held property primarily for sale to customers in the ordinary course of its trade or business and that condemnation

activities did not change the purpose for which portions of the property were held by the partnership. Although *Tri-S, Juleo*, and *Ridgewood* were declared distinguishable, their viability was questioned because in rejecting the taxpayers' argument that the condemnation action entitled them to long-term capital gain treatment with respect to sales made to the State of California, we stated (65 T.C. at 215–216):

> *In the case at hand we do not believe that the condemnation factor changed the partnership's intention in the manner found by this Court previously.*From the evidence in the record we believe that the partnership was in the business ab initio of purchasing raw land, improving it, and holding it for sale in that condition to prospective customers. Various governmental authorities could use the property in that condition and as such they represented potential customers for the partnership's property.
>
>     *      *      *      *      *      *      *
>
> In our view, the condemnation element did not bring any unexpected customers to the partnership's door, but rather served as the means by which the sale was conducted. We see no reason then why the gain produced by the sales to its governmental customers should be treated any differently than the gain realized by sales to its other customers. Petitioners' argument must be denied.
> [Emphasis supplied.]

Our *McManus* decision was affirmed by the Court of Appeals for the Ninth Circuit, which agreed with the reasoning of the Third Circuit.[4] See also *Case v. United States*, 633 F.2d 1240, 1246 (6th Cir. 1980), indicating the agreement of the Sixth Circuit with the Third Circuit's rationale in *Juleo*.

The results reached by this Court in *Tri-S, Juleo*, and *Ridgewood* were based on our belief that the pivotal focus

---

[4]See *McManus v. Commissioner*, 583 F.2d 443 (9th Cir. 1978), where the Court of Appeals said at page 447:

"The taxpayers make a further argument that even if the property was held for sale in the ordinary course of business, once the State of California began condemnation proceedings, their holding of the condemned parcel changed to one for investment because the taxpayers could no longer sell the property. The circuits are presently in disagreement as to the effects of condemnation in these circumstances. The Fifth Circuit agrees with the taxpayers' argument, *Ridgewood Land Co. Inc. v. Commissioner of Internal Revenue*, 477 F.2d 135 (5th Cir. 1973). The Third Circuit views the condemnation as merely the method of effecting the sale of the property; the court noted that the price paid for the condemned land included the value of the improvements and was affected by the surrounding sales. *Juleo, Inc. v. Commissioner of Internal Revenue*, 483 F.2d 47 (3rd Cir. 1973) *cert. denied*, 414 U.S. 1103, 94 S.Ct. 737, 38 L.Ed.2d 559. We agree with the reasoning of the Third Circuit. * * * Condemnation proceedings in this context meant only that the parties were unable to agree on the price, not that the character of the holding of the land was changed. * * * "

should be on the taxpayer's purpose for holding the property immediately after the receipt of the condemnation notice but prior to the actual sale. We now think this rationale is wrong.[5] What the taxpayer does with respect to the development of property *after* receiving the condemnation notice is irrelevant in terms of altering his purpose for holding it. Once a taxpayer receives a notice of condemnation, he knows that his ownership of the property will be terminated. At that point there is, in essence, a constructive sale of the property with only the price to be determined later. In other words, the destiny of the sale to the governmental body is established. Naturally, real estate dealers, such as petitioners, would abandon their development plans and change their "intent" by assuming an investment purpose for holding the property, i.e., for sale to the condemning authority. In such a situation, any change in purpose would amount to no more than a practical circumstance of the sale and would, in our judgment, generally have no tax significance of moment. See *Estate of Freeland v. Commissioner*, 393 F.2d 573, 584 (9th Cir. 1968), affg. T.C. Memo. 1966–283; *Municipal Bond Corp. v. Commissioner*, 341 F.2d 683, 689 (8th Cir. 1965). This is certainly not the kind of changeover time discussed in *Biedenharn Realty Co. v. United States*, 526 F.2d 409, 423 (5th Cir. 1976).

We think the approach we took in *Tri-S, Juleo,* and *Ridgewood* is logically inconsistent with the treatment the tax laws accord judicially enforceable payments in general and condemnation proceeds in particular. For example, amounts received in settlement of a claim for lost profits are taxed as ordinary income. *Raytheon Production Corp. v. Commissioner*, 144 F.2d 110 (1st Cir. 1944). If the claim is for damage to a capital asset, the amount received in settlement is treated as a return of capital, taxable at capital gain rates if the recovery

---

[5]It is true that a taxpayer may change his purpose for holding property. He may decide to develop and sell property which was initially purchased and held for investment, and the gain in such a case would properly be taxed as ordinary income (*Biedenharn Realty Co., Inc. v. United States*, 526 F.2d 409, 420–422 (5th Cir. 1976)). He may also decide to hold for investment property which was initially purchased for sale to customers in the ordinary course of business, and such proceeds would properly be taxed as a capital gain. *Maddux Construction Co. v. Commissioner*, 54 T.C. 1278, 1283 (1970). See also *Biedermann v. Commissioner*, 68 T.C. 1 (1977), where we decided that a development and sale purpose had changed into an investment purpose several years before either a threat or notice of condemnation by the State of Maryland.

exceeds the asset's basis. *Farmers' & Merchants' Bank v. Commissioner*, 59 F.2d 912 (6th Cir. 1932). If the claim is for an amount which would not constitute income to the recipient (e.g., an inheritance), it would retain its nontaxable status upon receipt. *Lyeth v. Hoey*, 305 U.S. 188 (1938).

The same tracing principle applies in determining the tax consequences of the sale of a going business. In *Williams v. McGowan*, 152 F.2d 570 (2d Cir. 1945), the Court of Appeals rejected the argument that in a sale of a going business all proceeds automatically should be considered as flowing from the sale of a capital asset. Instead, it was held that, for tax purposes, the assets of the business must be considered by category. Gain realized upon the sale of inventory is to be treated as ordinary income, and gain realized on the sale of a capital asset, such as good will, is entitled to capital gains treatment. See *Watson v. Commissioner*, 345 U.S. 544 (1953); *Stern v. Commissioner*, 66 T.C. 91 (1976). This principle is equally applicable to bulk sales of inventory by real estate developers. *Lawrie v. Commissioner*, 36 T.C. 1117, 1121 (1961).

Except as provided by statute, there is no basis for differentiating between voluntary and involuntary sales, such as condemnation. Cf. *Helvering v. Hammel*, 311 U.S. 504 (1941). Thus, the treatment of the proceeds of condemnation received by petitioners from the State of Maryland must be characterized for tax purposes by the nature of the underlying asset whose taking gave rise to their receipt. Since the Janes Island property condemned by the State of Maryland was not a capital asset (its having been held primarily for sale to customers in the ordinary course of business), the compensation received should be treated as ordinary income because it replaced the ordinary income the petitioners would have received had they sold the property to someone other than the State.[6]

Finally, with respect to condemnation proceeds, the Code envisions the possibility of ordinary income treatment of gains realized on the condemnation of inventory or property held for

---

[6]In real estate transactions, a sale to any purchaser, including a condemning governmental body, is, in effect, a sale to a "customer." See *McManus v. Commissioner*, 65 T.C. 197, 216 (1975), affd. 583 F.2d 443 (9th Cir. 1978); cf. *Pointer v. Commissioner*, 48 T.C. 906 (1967), affd. 419 F.2d 213 (9th Cir. 1969), involving a restricted group of purchasers.

sale in the ordinary course of business. Section 1231(a) provides in part for capital gain treatment of gains recognized upon the condemnation of property used in the taxpayer's trade or business. Section 1231(b)(1)(B), which defines such property, specifically provides that real estate which is held by the taxpayer "primarily for sale to customers in the ordinary course of his trade or business" cannot qualify for capital gain treatment under section 1231. Hence, our strict adherence to the per se rule of *Tri-S* would have the practical effect of nullifying the exception expressly provided for in section 1231(b)(1)(B).

Accordingly, we will follow the decision of the Court of Appeals for the Third Circuit in *Juleo,* and we will no longer follow our opinions in *Tri-S* and *Ridgewood* to the extent they hold that a condemnation notice, ipso facto, changed land held primarily for sale to customers in the ordinary course of business into a capital asset.

After consideration of all the facts and circumstances present in this case, we conclude that the petitioners held their Janes Island property for sale to customers in the ordinary course of their business when the condemnation sale to the State of Maryland was consummated in April 1975. Therefore, the gain therefrom is taxable as ordinary income.

## Issue 2. Section 6653(a) Additions to Tax

On their 1976 and 1977 Federal income tax returns, the petitioners deducted as a business expense not only the interest on certain loans but also the principal. This was clearly impermissible. This practice caused an understatement of petitioners' income in both years on which was based a deficiency assessment agreed to by them before they filed their petition in this case.

Petitioner testified at trial that although the treatment of payments on principal loan payments was incorrect, he had presented all of his books to his accountant on whom he relied for the proper preparation of the tax returns for the years in question based upon his books and records. Hence, the position is taken that although the records were incorrect, there was no intent to mislead the return preparer and, in fact, the petitioner relied upon the return preparer to ferret out and correct any mistakes which he might find in such records.

Petitioners have the burden of proving that no part of any underpayment of tax was due to negligence or intentional disregard of respondent's rules and regulations. *Farwell v. Commissioner*, 35 T.C. 454 (1960); *Leroy Jewelry Co. v. Commissioner*, 36 T.C. 443 (1961). They have not carried that burden. The general rule is that the duty of filing accurate returns cannot be avoided by placing the responsibility on an agent. *Bailey v. Commissioner*, 21 T.C. 678 (1954); *American Properties, Inc. v. Commissioner*, 28 T.C. 1100 (1957), affd. per curiam 262 F.2d 150 (9th Cir. 1958); and *Pritchett v. Commissioner*, 63 T.C. 149 (1974).

While petitioner may have presented to the return preparer all of the books and records, the examining agent testified that one, examining the books alone, would not have been able to determine the discrepancy which caused the underpayment in 1976 and 1977. He testified that he could not make the determination that loan principal had been erroneously deducted until he had examined petitioners' bank statements and loan schedules for the relevant years. In other words, it required an audit of petitioners' books and records, as well as third party records, rather than a mere perusal. Petitioners presented no evidence of the fact that their return preparer was responsible for an audit of their books and records, or third party records, rather than preparation of returns from books and records. They have not satisfied their burden of establishing that they supplied their return preparer with the "correct" information and that the incorrect returns were a result of the preparer's mistakes. See *Pessin v. Commissioner*, 59 T.C. 473, 489 (1972), citing *Enoch v. Commissioner*, 57 T.C. 781, 803 (1972).

Accordingly, we sustain respondent's determination with respect to the additions to tax under section 6653(a).

*Decision will be entered for the respondent.*

Reviewed by the Court.

FAY, *J.*, concurring: I agree with Judge Goffe that the instant case does not reach the question of the characterization of proceeds of an after-notice sale to a party other than

the condemner. Additionally, I believe the opening extends to a myriad of unforeseeable events which might occur after condemnation notice, such as the discovery of oil or rich hard mineral deposits. It is quite possible that, irrespective of condemnation notice, a taxpayer's intended use of property may change.

GOFFE, *J.*, agrees with this concurring opinion.

GOFFE, *J.*, concurring: I fully agree with the holding of the majority and with what the majority opinion says. I feel it should be pointed out, however, what, in my view, the opinion of the majority does not say and does not hold. We make no holding nor implication as to the effect, if any, upon the purpose for which property is held if a threat of condemnation is made and the owner of the property sells the property to a third party before receiving the proceeds of the condemnation.

FAY, *J.*, agrees with this concurring opinion.