HOWARD J. SCHWARTZ AND GLORIA SCHWARTZ, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Schwartz v. Commissioner
Docket Nos. 5221-85; 24956-86.
United States Tax Court
T.C. Memo 1989-97; 1989 Tax Ct. Memo LEXIS 97; 56 T.C.M. (CCH) 1417; T.C.M. (RIA) 89097; March 13, 1989. S. Sidney Mandel and Edward L. Sadowsky, for the petitioners. Kevin Flynn, for the respondent. JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION JACOBS, Judge: Respondent determined the following deficiencies and additions to tax: Additions to Tax
Year
Deficiency
Sec. 6653(a)(1) [1]
Sec. 6653(a)(2)
Sec. 6661
1980
$  9,554.71
--
--
--
1982
$ 65,624.00
$ 3,281.20 *
$ 6,562.40
*98 After concessions by petitioners, the issues for decision are (1) whether payments made to Howard J. Schwartz by the former stockholders of Catallactics Corporation in 1980 and 1982 constitute compensation income or non-taxable gifts; (2) whether petitioners, in 1982, are liable for additions to tax for negligence under sections 6653(a)(1) and 6653(a)(2); and (3) whether petitioners, in 1982, are liable for the addition to tax for substantial understatement of tax under section 6661. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners, Howard J. and Gloria Schwartz, husband and wife, resided in New York City at the time their petitions in these consolidated cases were filed. Gloria Schwartz is a party herein solely by virtue of having filed a joint return with her husband; accordingly, Howard J. Schwartz hereinafter will be referred to as petitioner. Catallactics Corporation (Catallactics), the stock of which was privately-held, [2] was engaged in the business of providing computer software and services to large financial institutions. Petitioner *99 was its eastern regional sales manager, responsible for the sale of computer software and services to trust departments of major banks and other financial institutions in the New York metropolitan area, as well as monitoring existing accounts. He secured many significant customers, and Catallactics' financial success in New York was largely attributable to his efforts. Prior to 1979, petitioner inquired as to the prospects of acquiring an equity interest in Catallactics and although he was not made a stockholder, he was informed that should Catallactics' stock appreciate in value and be sold, he also would benefit. During the Fall of 1979, the six owners (the Former Stockholders) of Catallactics entered into negotiations to sell their stock to a subsidiary of The Sun Oil Company (Sun), a publicly-held corporation. The negotiations culminated in the execution of a stock purchase agreement *100 on November 20, 1979. Pursuant to such agreement, Sun paid the former stockholders an initial payment of two million dollars and was obligated to pay an additional payment, referred to as an earn-out payment, of up to six million dollars, depending upon the amount of Catallactics' profits for years 1979, 1980 and 1981. After the stock sale was consummated, several of the Former Stockholders continued in their positions as executives of Catallactics, including Michael Northrop who remained Catallactics' president. Contemporaneously with the sale of stock, the Former Stockholders entered into separate earn-out agreements with petitioner and other key employees of Catallactics. Each of these earn-out agreements, dated November 20, 1979, provided that if the key employee remained in the employ of Catallactics until December 31, 1981, he would receive, subject to a maximum amount, a percentage of the excess of the sum of Catallactics' "cumulative net profits" (as defined in the earn-out agreement) for 1979, 1980 and 1981 over a base amount. As to petitioner, the maximum earn-out he could receive was $ 215,000. Petitioner's earn-out agreement provided that should he not be in the *101 employ of Catallactics on December 31, 1981, then (a) if the reason for his termination was cause (as specified in the earn-out agreement) or was a result of his decision to leave, he would forfeit his right to receive the earn-out payment; or (b) if the reason for his termination was his death or disability or because Catallactics dismissed him (other than for cause), he (or his personal representative in the event of his death) would receive a reduced earn-out payment equal in amount to the product obtained by multiplying (i) the amount he otherwise would have received had his employment not been terminated, by (ii) a fraction, the numerator of which was equal to the number of weeks he remained in Catallactics' employ after November 19, 1979, and the denominator of which was 110. [3]
*102 On July 25, 1980, Catallactics terminated petitioner's employment, the reason for such being other than for cause. Several days thereafter Mr. Northrop sent petitioner a proposed severance agreement (the Severance Agreement) [4] which, among other things, provided that petitioner would receive: 1. A $ 6,000 severance payment by Catallactics (which represented one month's salary), to be made in two equal installments on August 16 and September 1, 1980; 2. Guaranteed and nonrefundable payments from the earn-out by the Former Stockholders totalling $ 30,000, of which $ 22,000 was payable in 1980, and $ 8,000 in 1981; and 3. A payment of 75 percent [5] of the amount petitioner would have received from the Former Stockholders had his employment with Catallactics not been terminated, less the amount of the guaranteed payments. *103 The Severance Agreement required that petitioner: (1) not accept employment in competition with Catallactics within its major markets for a period of twenty (20) months; (2) refrain for two years from disclosing confidential information he received while at Catallactics; and (3) not impugn or denigrate the reputation of Catallactics or the Former Stockholders. Failure to comply with any of these prohibitions would result in petitioner's forfeiting the remaining payments due under the Severance Agreement. As provided in the Severance Agreement, petitioner received (in addition to the $ 6,000 severance payment) payments from the Former Stockholders totalling $ 22,000 in 1980 and $ 131,247 in 1982. Although Forms 1099 NEC (non-employee compensation) were sent to petitioner in the amounts of these payments, [6] he did not include them in income, contending that they were voluntary and hence constituted non-taxable gifts. Respondent claims such payments are includible in income as compensation. In his brief, petitioner concedes that the earn-out payments attributable *104 to the period beginning with the commencement of the earn-out (November 20, 1979) and ending with his termination of employment with Catallactics (July 25, 1980) constitute compensation income. OPINION The leading case as to whether payments are gifts or compensation is Commissioner v. Duberstein,363 U.S. 278, 285-286 (1960), wherein the Supreme Court enunciated the following principles: The mere absence of a legal or moral obligation to make such a payment does not establish that it is a gift. * * * And, importantly, if the payment proceeds primarily from "the constraining force of any moral or legal duty," or from "the incentive of anticipated benefit" of an economic nature, * * * it is not a gift. And, conversely, "[w]here the payment is in return for services rendered, it is irrelevant that the donor derives no economic benefit from it." * * * A gift in the statutory sense, on the other hand, proceeds from a "detached and disinterested generosity," * * * "out of affection, respect, admiration, charity or like impulses." * * * And, in this regard, the most critical *105 consideration, as the Court was agreed in the leading case here, is the transferor's "intention." * * * "What controls is the intention with which payment, however voluntary, has been made." [Footnotes and citations omitted.] In applying these principles to the facts herein, we must make an objective inquiry into the intent of the Former Stockholders in making the earn-out payments to petitioner. Commissioner v. Duberstein, supra at 285. The totality of the facts herein amply demonstrates that the earn-out payments were not motivated "by a detached and disinterested generosity" and that the Former Stockholders did not intend such payments to be gifts. Mr. Northrop, as the representative of the Former Stockholders, testified that the earn-out payments were made to petitioner and the other key employees for two reasons: (1) to compensate them for their past contributions, and (2) to provide them with an incentive to assist the Former Stockholders in achieving the maximum amount of the additional payment from Sun. Petitioner concedes that the earn-out payments attributable to the number of weeks he was employed from November 20, 1979 to July 25, 1980 (34 weeks) *106 are taxable. He claims that the earn-out payments attributable to the time period following his termination were gifts because the Former Stockholders had no legal obligation to make them. The absence of a legal obligation, however, is not determinative in deciding whether a gift has been made. Commissioner v. Duberstein, supra. Payment for services, even though voluntary, is compensatory in nature. Miller v. Commissioner,39 T.C. 505 (1962), affd. 327 F.2d 846 (2d Cir. 1964), cert. denied 379 U.S. 816 (1964). Mr. Northrop testified that he and the other Former Stockholders were aware that they were legally obligated to pay petitioner only for that time period expiring on the date of petitioner's termination, but he stated he and the other Former Stockholders "felt an obligation to Howard because of the work he had done and the contributions [to Catallactics] that he had made." Mr. Northrop said he did not use a slide rule in calculating the percentage of the earn-out to be paid to petitioner as of July 25, 1979 (the date *107 of termination), but rather he and the other Former Stockholders felt that a 75 percent payment was "ethically right and proper" because "much of what was to be paid to Howard (under the earn-out) had already been earned by him." Mr. Northrop further testified that the obtaining of the restrictive covenants in the Severance Agreement from petitioner was important in the Former Stockholders' decision to pay petitioner the increased earn-out amount. He stated he did not want to "fight fires" started by a disgruntled employee's divulging Catallactics' confidential business and technical information. Petitioner's receipt of the increased earn-out payment was in exchange for and conditioned upon the restrictive covenants, which, in our opinion, is an indication that the earn-out payments were not gifts. See Jackson v. Commissioner,25 T.C. 1106 (1956). Further probative is the issuance of the Form 1099-NECs, which is consistent with Mr. Northrop's credible testimony that the Former Stockholders' payments to petitioner were intended to be compensatory. Accordingly, we hold that the entire earn-out amount constitutes compensation and that the earn-out payments should *108 have been included in petitioner's income in the years received. In reaching this decision, we have considered petitioner's other arguments (which we find unpersuasive) and the cases cited in support thereof (which we find distinguishable from this case). We now shall consider whether petitioners are liable in 1982 for additions to tax for negligence pursuant to sections 6653(a)(1) and 6653(a)(2). Section 6653(a)(1) provides for an addition to tax in an amount equal to 5 percent of the underpayment if any part of the underpayment is due to negligence or intentional disregard of rules and regulations. Section 6653(a)(2) provides for an addition to tax in an amount equal to 50 percent of the interest payable under section 6601 with respect to that portion of an underpayment attributable to negligence or intentional disregard of rules and regulations. Petitioners have the burden of proving that the underpayment of tax was not due to their negligence or intentional disregard of rules and regulations. Bixby v. Commissioner,58 T.C. 757 (1972); Enoch v. Commissioner,57 T.C. 781 (1972). *109 Negligence is defined as the lack of due care or failure to do what an ordinarily prudent person would do under the circumstances. Neely v. Commissioner,85 T.C. 934 (1985). On brief, petitioners contend that their reliance upon counsel prevents imposition of the negligence additions to tax. Daugherty v. Commissioner,78 T.C. 623 (1982). As a general rule, it is the duty of the taxpayer to file accurate returns, and this duty cannot be avoided by placing responsibility on an agent. Pritchett v. Commissioner,63 T.C. 149, 174 (1974). An exception to this rule exists where the taxpayer relies upon tax advice from counsel. Woodbury v. Commissioner,49 T.C. 180 (1967). However, reliance upon expert advice does not necessarily insulate the taxpayer from liability for the negligence addition to tax. The taxpayer's reliance on such advice must be reasonable, Freytag v. Commissioner,89 T.C. 849, 888 (1987); in *110 good faith, Ewing v. Commissioner,91 T.C. 396, 423 (1988); and based upon complete and accurate disclosure, Daughterty v. Commissioner,78 T.C. at 641. In a brief colloquy with the Court, petitioner stated that he sought the opinion of counsel with respect to the reporting of the earn-out payments and was told they were gifts. Counsel for petitioners, however, did not pursue this matter; there was no showing that petitioner informed counsel as to all relevant facts from which counsel could opine in good faith. In his reply brief, counsel for petitioners asserts for the first time certain facts which might have supported a reliance on counsel defense. However, facts raised for the first time on brief are not part of the record. Rule 143(b). Based on the record, we find that petitioners failed to establish a reliance on counsel defense or that the underpayment of tax was not due to their negligence or intentional disregard of rules and regulations. Accordingly, respondent's determination that petitioners are liable for the additions to tax in 1982 under *111 sections 6653(a)(1) and 6653(a)(2) is sustained. Respondent also determined an addition to tax under section 6661 for 1982. Section 6661(a) provides that, in the event of a substantial understatement of income tax for any taxable year, there shall be added to the tax an amount equal to 10 percent [7] of the underpayment attributable to such understatement. Section 6661(b) provides that a "substantial understatement" exists if the amount of the understatement of tax for the year exceeds the greater of (1) 10 percent of the tax required to be shown on the return, or (2) $ 5,000. Here, the understatement of tax for 1982 exceeds the threshold amounts; hence, a "substantial understatement" of income tax exists. *112 Section 6661(b)(2)(B) provides for a reduction in the amount of the understatement of income tax for items with respect to which (a) there is or was substantial authority for the taxpayer's treatment, or (b) the relevant facts affecting the tax treatment of such items are adquately disclosed in the taxpayer's return or in a statement attached to the return. Petitioners' 1982 return did not disclose, by means of a statement or otherwise, any facts underlying the omission of the earn-out payments. Nor, in our opinion, is there substantial authority to support such omission. The facts in each of the cases cited by petitioners are distinguishable from those involved herein. Further, petitioners concede that a part of the earn-out payments received constitute compensation income. On brief, petitioners argue that the addition to tax under section 6661 can be waived. This waiver authority, however, resides with the Secretary of the Treasury or his delegate, not with the Court. Section 6661(c). Moreover, petitioners have not argued that respondent abused its discretion in failing to grant a waiver. Mailman v. Commissioner,91 T.C. 1079 (1988). Accordingly, respondent's *113 determination that petitioners are liable for the addition to tax under section 6661 for 1982 is sustained. To reflect the foregoing, and petitioners' concessions, Decision will be entered for respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. * 50 percent of the interest due on $ 65,624.00↩
2. Prior to November 20, 1979, the stock of Catallatics was owned as follows: ↩
Approximate Stock Ownership
Stockholder
Percentage
Robert W. Doede
54
Kenneth R. Jensen
21
Michael S. Northrop
12
Philip L. Dowd
5
E. Allan Peterson
5
David E. Robinson
3
3. The earn-out agreement lists November 30, 1979, as the beginning date for the earn-out period. In our opinion, a typographical error occurred, and the intended beginning date for the earn-out period is November 20, 1979. We believe this to be the case because the length of the earn-out period is 110 weeks which is the number of weeks between November 20, 1979 (the date the Catallactics' stock was sold) and December 31, 1981 (the end of the earn-out period). The parties have also used November 20, 1979, as the beginning date for the earn-out period.↩
4. The letter transmitting the Severance Agreement, in part, stated: I have done what I believe to be fair for both parties. I am trying to provide you with an opportunity to participate in Catco's [Catallactics'] "earn-out" while at the same time permitting you to find gainful employment. I don't know of another way to do this. If you have suggestions, please let me know. Keep in mind that your suggestions must meet your requirements and the requirements of the former Catco shareholders. I stand willing to discuss this document with you at any time. * * * ↩
5. Petitioner could have received a payment equal to 100 percent of the earn-out payment if the Former Stockholders received an early payment (i.e., in 1980) of their earn-out from Sun. Such did not occur; therefore, petitioner was entitled to receive only the lesser 75 percent amount.↩
6. Petitioner claims he did not receive a Form 1099 NEC for 1980; he acknowledges he received a Form 1099 NEC for 1982.↩
7. In Pallottini v. Commissioner,90 T.C. 498, 503 (1988), we held that the rate of the addition to tax under section 6661(a)↩ is 25 percent for additions assessed after October 21, 1986. As respondent has not claimed entitlement to the increased rate, we shall not consider it.